Dorothy **HOOTS, et al., Plaintiffs,**

v.

**Commonwealth of PENNSYLVANIA, et al., Defendants.**

**No. CIV A 71–538.**

United States District Court, W.D. Pennsylvania.

July 25, 2000.

578

Mark Fatla, Pittsburgh, PA, for Plaintiffs.

## OPINION

COHILL, Senior District Judge.

This case comes before us on motions filed by defendants Woodland Hills School District ("WHSD" or "the District") and the Commonwealth of Pennsylvania, seeking a declaration of unitary status and the end of judicial supervision of the District's schools. Plaintiffs, representing a class of children and parents in the District, oppose these motions. For the reasons set forth below, we will grant defendants' motions in part and deny them in part, and thus commensurately curtail our oversight of the District's schools.

### Background

The underlying facts of this case have been well documented numerous times throughout the past twenty-nine years. To provide a context for our consideration of the question of unitary status, however, we will briefly summarize the relevant developments in this litigation.

During the 1960s, the Pennsylvania Legislature enacted legislation to consolidate smaller school districts in the Commonwealth's public school system. The Com-

monwealth ultimately approved the creation of the General Braddock Area School District, which combined the school districts of the Boroughs of Braddock, North Braddock, and Rankin in eastern Allegheny County. These were all financially troubled districts, and they also contained the largest concentration of minority students in this portion of the county. The Commonwealth also approved the creation or preservation of several neighboring school districts which were overwhelmingly white and economically affluent, including the school districts of Turtle Creek, Swissvale Area, Churchill Area, and Edgewood. This case was originally filed in 1971, when plaintiffs, representing a class of parents and children in the General Braddock Area School District, challenged the newly created district as racially discriminatory.

The late Judge Gerald Weber conducted a trial on plaintiffs' claims, and determined that the creation of the General Braddock Area School District was an act of *de jure* discrimination, in violation of the Fourteenth Amendment. *Hoots v. Commonwealth of Pennsylvania (Hoots II)*, 359 F.Supp. 807, 823 (W.D.Pa.); *aff'd*, 495 F.2d 1095 (3d Cir.1974); *cert. denied*, 419 U.S. 884, 95 S.Ct. 150, 42 L.Ed.2d 124 (1974).

This finding of liability against the then defendants Commonwealth of Pennsylvania, state Board of Education, and Allegheny County Board of School Directors, marked the beginning of the next phase of the case. Judge Weber directed the defendants to prepare a comprehensive

school desegregation plan to remedy the Constitutional violations. There followed a series of proposed remedies, each of which the Court determined to be inadequate.[1] In the spring of 1981, the plaintiff class presented a merger plan, proposing a consolidation of the General Braddock Area School District with several neighboring districts serving predominantly white populations. Following a hearing on this proposal, the Court adopted the plaintiffs' plan and ordered the immediate merger of the General Braddock Area School District with the districts of Edgewood, Churchill, Swissvale, and Turtle Creek. *Hoots VIII*, 545 F.Supp. 1 (W.D.Pa.1981). The Court of Appeals for the Third Circuit affirmed both the merger and the underlying finding of *de jure* discrimination. *Hoots IX*, 672 F.2d 1107 (3d Cir.), *cert. denied*, 459 U.S. 824, 103 S.Ct. 55, 74 L.Ed.2d 60 (1982).

What was then known as the "New District" and later became the Woodland Hills School District, began operation with the 1981—82 school year. The second decade of this litigation saw the gradual development and implementation of remedial student assignment and transportation plans, designed to desegregate all of the District's schools. Judge Weber ordered an interim arrangement to desegregate the secondary schools during that first year, and directed the School Board to submit a plan for full desegregation of all the New District's schools. Ultimately, the School Board proved unable to do so.[2]

1. *Hoots IV*, 587 F.2d 1340 (3d Cir.1978); *Hoots V*, 639 F.2d 972 (3d Cir.1981); *Hoots VII*, unpublished memorandum CA 71–538 (W.D.Pa. April 6, 1981).

2. The strong resistence from many in the predominately white communities in the New District continued through much of this time, and certainly made it more difficult for the School Board to comply with the Court's orders. Judge Weber recognized this fact in his Opinion on student assignment:

We recognize that the Board has a heavy burden. The majority of its members were members of the boards of constituent school districts that consistently opposed any desegregation remedy that involved their districts and authorized appeals that are still pending. Even with the best of present intentions old loyalties are hard to forget. They are also under intense present pressures from individuals and groups who opposed any efforts to carry out the desegregation order, by open tactics of harassment and intimidation.

*Hoots VIII*, 539 F.Supp. 335, 339 (W.D.Pa. 1982).

Following hearings on plans submitted by both parties, the Court adopted a comprehensive student assignment plan covering grades 1—12 for the 1982—83 school year. *Hoots XIII*, 539 F.Supp. 335 (W.D.Pa 1982), *aff'd, Hoots XIV*, 703 F.2d 772 (3d Cir.1983). At the elementary level, the assignment of students was based upon "paired" or "clustered" schools, configured as K—3 and 4—6; this arrangement successfully integrated the student populations, maintained two elementary facilities in the minority community, and required that both black and white students share the burden of transportation.

In 1987, the parties successfully negotiated a district-wide reorganization involving building utilization, grade structure, and student assignments. This configuration remains in effect at the present time, although changes from a junior high to a middle school structure are contemplated.[3]

The pairing of schools continues, and the burden of transportation remains shared by all students. Students in the former General Braddock Area School District travel to schools in the predominately white communities for grades K through 3; then all students at those schools attend grades 4–6 in facilities located in the minority community. Students throughout the District are transported to the junior and senior high schools.

By 1987, then, the attendance plan placed all children in desegregated facilities and imposed the burden of transportation on both black and white students. However, the discriminatory effects of the constitutional violation remained evident in such areas as student activities, guidance and discipline, educational programs, including special education, and staff assignments. Thus the defendants, with much prodding by the Court, began the process of implementing programs to remedy the vestiges of discrimination. Many of these racial disparities and remedies were first articulated in a Consent Decree, which was negotiated by the parties and presented to the Court on July 12, 1988.[4]

Judge Weber passed away in August, 1989, before any agreement could be reached on a remedial plan. This case was then assigned to the undersigned. The Court appointed a Hearing Officer, Mark T. Fatla, Esquire, to conduct a hearing on the parties' conflicting implementation plans. After six weeks of hearings, he issued a Report and Recommendation Regarding Desegregation Remedies on August 20, 1990 ("1990 R & R"). The Court then heard argument and adopted the Report and Recommendation, with three exceptions, including activities, in an unpublished Opinion and Order dated January 16, 1991 ("1991 Opinion & Order").

3. The District maintains three K–3 elementary schools (Edgewood, Shaffer, and Wilkins); three 4–6 elementary schools (Dickson, Fairless, and Rankin); two junior high schools, serving grades 7 through 9 (East, located in the former Turtle Creek High School facility, and West, located in the former Swissvale High School building); and one consolidated high school, for students in grades 10–12, known as Woodland Hills High School ("WHHS") and located in the former Churchill High School.

4. All parties acknowledge that the Commonwealth has never signed the Consent Decree. We addressed this fact at ¶ 18 of our 1991 Opinion and Order, where we noted that the Consent Decree was not binding on the Commonwealth but remained a part of the history of this case. The 1990 R & R emphasized that "the Commonwealth participated in the

negotiation and drafting of the Consent Decree, and indeed joined in the motion seeking the Court's approval and entry of judgment," and that "[t]he Decree as negotiated with the Commonwealth contains a section describing the Commonwealth's obligations." 1990 R & R at 15, citing Consent Decree, § X, pp. 66–67. Although some of the court-ordered ancillary remedial programs ordered in this case first appeared in the Consent Decree, our remedial orders have never rested on that document, but are instead grounded in our 1991 Opinion and Order and in our subsequent orders modifying or extending that relief. The Commonwealth was adjudged to be the constitutional violator in this action when it approved the creation of the General Braddock Area School District, and that violation is the source of its remedial obligation here.

Recognizing that the vestiges of discrimination were embedded deep in all aspects of school life, we ordered that remedies for the constitutional violation proceed along several fronts at once. To assure that all students in the District received an equal education, we ordered a comprehensive redesign of curriculum and testing, so that the curriculum would be appropriate for heterogeneous, multicultural, detracked classrooms [5] and that the effectiveness of this redesigned curriculum would be carefully monitored through proper assessments. We recognized, however, that merely providing an equal educational opportunity from 1991 forward would not address the existing gap between the races in academic performance. (1991 Opinion at 4.) Children who were already behind as a result of a segregated school system needed additional help, and, to that end, we ordered the District to implement appropriate compensatory and remedial programs beginning at the elementary level.

We also acknowledged the difficulties inherent in expecting teachers who were familiar only with tracked, homogeneous classrooms, to teach in the District's multicultural, detracked setting. Therefore, as part of the remedy we ordered the District to provide appropriate in-service training and workshops for its teachers and other staff.

To address the clear racial disparities in discipline, we ordered the District to reorganize the guidance department and to hire a number of new guidance counselors.

Our 1991 Opinion and Order included a variety of other miscellaneous remedial relief, including the hiring of certain specified personnel, although we declined to order the District to provide after-school transportation for activities. We also ordered that the cost of all court-ordered remedial programs be funded 90% by the defendant Commonwealth, as the party charged with the constitutional violation, and 10% by the District. (1991 Opinion & Order at ¶ 17; 1990 R & R at 96.)

The Court of Appeals reversed this Court's ruling on activities, and affirmed on all other issues. *Hoots XVI,* Nos. 91–3316, 91–3317, 91–3319, 91–3436, 1992 WL 289174 (3d Cir. filed Sept. 21, 1992). The 1990 R & R and the 1991 Opinion and Order remain the basis of the court-ordered remedies in place today.

Implementing the appropriate remedies and measuring their effectiveness remained a point of friction between the parties. In 1995, we again appointed Mr. Fatla to act as a Special Master in this matter. In that position he has conducted a series of hearings, including a lengthy hearing in 1997 on discipline and guidance, issued several Reports and Recommendations, and held regularly scheduled status conferences to attempt to resolve ongoing remedy and budget issues. Mr. Fatla has served the Court and the parties well in this capacity.

The defendants each filed motions for a declaration that the District has achieved unitary status in October of 1999. In addition, the District filed a unitary status transition plan. A hearing on these motions commenced on April 3, 2000, and we heard closing arguments on May 16. Defendants presented the testimony of District Superintendent Dr. Stanley Herman, Dr. Christine Rossell, Dr. Stefan Biancaniello, Dr. Jacquelyn Webb, Leah McCord, Norman Catalano, Dr. Vijai Singh, Dr. James Henderson, Dr. Charles Achilles, Dr. David Armor, Dr. Joel Reed, Dr. Roslynne Wilson, Chester C. Kent, Dr. Elmer Haymon, Jr., and Judge John McLean, Jr., who served as the most recent court-appointed Monitor in this action. The plaintiffs presented the testimony of Kay

---

**5.** "Tracking" is the process of assigning students to classes based on their perceived ability—i.e. "low" students are assigned to one class, "average" students to another and "high" to a third. Most academicians now agree that it is better to mix rather than assign students in this manner. *See* our discussion of tracking at Woodland Hills commencing at page 591–92, *infra.*

Brown, Dr. Olatokunbo Fashola, Dr. Jan de Leeuw, Dr. Lea Hubbard, Dr. Robert Cooper, and Dr. William Gordon. Rebuttal testimony was given by WHSD School Board President Dr. Randy Lott, and by Dr. Herman and Dr. Rossell.

The Court also asked to visit several of the District's schools. On April 19, 2000, accompanied by Superintendent Herman and by counsel for all parties, the Court had a first-hand opportunity to visit some of the school facilities and to observe classrooms and instructional techniques. At the Court's request plaintiffs selected the schools for the visit, and arrangements were made to tour Wilkins and Dickson elementary schools, West Junior High School, and Woodland Hills Senior High School.

Having considered all of the testimony and all of the evidence, we turn now to the question of whether the defendants have achieved unitary status by complying, in good faith, with this Court's remedial orders.

### Legal Standards

■ Federal judicial supervision of a local school district is intended to be a temporary measure. *Board of Educ. v. Dowell*, 498 U.S., 237, 247–48, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991); *Coalition to Save Our Children v. State Bd. of Educ.*, 90 F.3d 752, 761 (3d Cir.1996.) The court's aim must be to remedy the constitutional violation, and then "to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution." *Freeman v. Pitts*, 503 U.S. 467, 489, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992) (citing *Milliken v. Bradley*, 433 U.S. 267, 280–81, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977)). "The duty and responsibility of a school district once segregated by law is to take all steps necessary to eliminate the vestiges of the unconstitutional de jure system." *Freeman*, 503 U.S. at 485, 112 S.Ct. 1430. When a school district has done so, we say that the district is now "unitary," because

it no longer operates a dual, or segregated, system of education.

■ However, although achieving "unitary status" and thus relief from judicial supervision is the school district's goal, the term itself does not have a fixed meaning, "and does not confine the discretion and authority of the District Court in a way that departs from traditional equitable principles." *Freeman*, 503 U.S. at 487, 112 S.Ct. 1430 (citing *Dowell*, 498 U.S. at 245–46, 111 S.Ct. 630). Each school desegregation case must be evaluated on a careful assessment of its particular facts. *Freeman*, 503 U.S. at 474, 112 S.Ct. 1430. Equity permits a federal court "to relinquish supervision and control of school districts in incremental stages, before full compliance has been achieved in every area of school operations." *Id.* at 490–491, 112 S.Ct. 1430. "A transition phase in which control is relinquished in a gradual way is an appropriate means to this end." *Id.* at 490, 112 S.Ct. 1430. In addition, where vestiges of a dual system remain in some, but not all, areas under judicial supervision, the "district court will retain jurisdiction over the school system, but need not maintain constant supervision or control over factors as to which compliance has been achieved." *Id.* at 507, 112 S.Ct. 1430 (Souter, J. concurring).

WHSD insists that because the original constitutional violation in this case was the Commonwealth's decision to draw the school district boundary lines which created the General Braddock Area School District, that "[s]ince 1981, WHSD has operated as a unified system." Defendants' Findings of Fact and Conclusions of Law at ¶¶ 22, 23. We agree; unitary status, however, requires more than a racially integrated school district; the constitutional obligation has not been met until the school district affirmatively has eliminated the vestiges of segregation. *Coalition*, 90 F.3d at 759 (citing *Green v. County School Bd.*, 391 U.S. 430, 435, 437–38, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)).

■ In deciding a motion for unitary status, the court must determine "whether the [constitutional violator] ha[s] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable." *Coalition*, 90 F.3d at 760 (1996) (quoting *Freeman*, 503 U.S. at 492, 112 S.Ct. 1430).

■ The Supreme Court has identified certain components of school operations that a court deciding a question of unitary status must evaluate: student building assignment, faculty and staff assignment within the school district, transportation, facilities, and extracurricular activities. *Green v. County School Bd.*, 391 U.S. 430, 435, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Dowell*, 498 U.S. at 250, 111 S.Ct. 630. "[C]ompliance with these '*Green* Factors' is a condition precedent to unitary status." *Coalition*, 90 F.3d at 776.

■ Ascertaining whether the school district has complied with the Green factors, however, does not end the court's inquiry into whether the vestiges of past discrimination have been sufficiently eliminated so that unitary status has been achieved. The court must also determine whether the school district has complied with any court-ordered ancillary remedial programs. *Coalition*, 90 F.3d at 760.

■ Once a constitutional violation has been established, the defendant "bears the burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation." *Freeman*, 503 U.S. at 494, 112 S.Ct. 1430. "[T]here is a presumption that current disparities are the result of the defendant's unconstitutional conduct." *Jenkins v. Missouri*, 122 F.3d 588, 593 (8th Cir.1997). To counter that presumption, the defendants may offer proof that any current racial disparity in areas encompassed by either the Green factors or the court-ordered ancillary relief, is caused by variables outside the school district's control and thus is not a vestige of the prior constitutional violation.

"It is beyond the authority and beyond the practical ability of the federal courts to try to counteract" such forces. *Freeman*, 503 U.S. at 495–96, 112 S.Ct. 1430; *Missouri v. Jenkins*, 515 U.S. 70, 102, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995). "As the *de jure* violation becomes more remote in time ... it becomes less likely that a current racial imbalance in a school district is a vestige of the prior *de jure* system." *Freeman*, 503 U.S. at 491–92, 112 S.Ct. 1430. To state the obvious, "court-ordered school desegregation alone cannot eliminate racial discrimination." *Coalition*, 90 F.3d at 756.

■ Once a court determines that a school district has attained unitary status, the burden of proving that any future disparities are caused by intentional segregation shifts back to the plaintiffs. *Jenkins v. Missouri*, 122 F.3d at 593.

Applying this general legal framework to the specific facts of this case, the Court makes the following findings of fact and conclusions of law.

### Green Factors

A court considering the question of unitary status must determine that the school district has complied with each of the Green factors.

### Student Assignment

*Findings of Fact:*

Whether the students in the District's schools are assigned to schools which have been desegregated so as not to be identifiably white or African–American is not seriously in dispute at this point in this litigation. Indeed, as early as 1990–91, we found that "each of the District's nine school buildings reflects very closely the proportion of minority students in the community." (1990 R & R at 6.)

As of January 27, 2000, the enrollment of African–American students in WHSD's nine schools was as follows: Edgewood Primary School, 387 or 54.7% of 707 students; Shaffer Primary School, 253 or 57.8% of 438 students; Wilkins Primary

School, 311 or 50.1% of 621 students; Dickson Intermediate School, 236 or 48.9% of 483 students; Benjamin Fairless Intermediate School, 227 or 46.8% of 485 students; Rankin Intermediate School, 208 or 56.1% of 371 students; West Junior High School, 414 or 45.1% of 918 students; East Junior High School, 274 or 45.1% of 607 students; and Woodland Hills High School, 411 or 32.0% of 1286 students. (WHSD Ex. 13–21.)

Plaintiffs agree that the District has achieved desegregated building assignments. (Pls.' F & C at ¶ 42.) Plaintiffs' expert, Dr. Gordon, acknowledged that the District had maintained desegregated building enrollments in compliance with various Orders of Court for at least the past sixteen years. (Tr. 5/8/00, at 146.)

Plaintiffs contend, however, that student assignment to individual classrooms is not always desegregated, and that certain courses have a racial imbalance in their student populations. To the extent that this premise relies on the "plus or minus 30% standard" contained in the Consent Decree, we must emphasize that we have never adopted that standard in any of the orders binding all of the parties in this case. Furthermore, the testimony of defendant's expert, Dr. Rossell, established that the percentage of students in the District's classrooms which are racially balanced within plus or minus 20 percentage points is extremely high.[6]

*Conclusions of Law:*

■ We determined that the facilities in the Woodland Hills School District were successfully desegregated in 1990, and the issue has not been contested since that date. We are satisfied that students throughout the District attend classes which are racially balanced to a very high degree. Accordingly, we find that the District has achieved unitary status as to this Green factor.

## Faculty and Staff Assignment

*Findings of Fact:*

The 1990 R & R concluded that serious racial disparities remained at all levels of the District's staff, despite the existence of a voluntary affirmative action plan. (1990 R & R at 29.) As the Hearing Officer noted, the staff of the component districts at the time of the merger included very few African–American professionals. (*Id.* at 27.)

Defendants' expert Dr. Christine Rossell analyzed data regarding WHSD faculty and staff. She testified that the racial balance of the faculty and professional staff of each of the nine schools in WHSD is within plus or minus 10 percentage points of the school system's percentage of African–American teachers. (Commw. Ex. 1005, 1014; Tr. 4/11/00 at 33, 56.) In other words, although the percentage of African–American faculty and staff varies from one school to another, across the District those percentages are within an acceptable range.

Dr. Rossell also testified regarding the support staff in the District's schools. The support staff of WHSD's middle schools and the high school are racially balanced at plus or minus 10 percentage points.[7]

---

6. For the 1999–2000 school year, 100% of elementary students, 85% of junior high school students, and 89% of high school students are in classrooms which are racially balanced within plus or minus 20% white. (Commw.Ex. 1017.) 100% of elementary students, 85% of junior high students, and 87% of high school students are in classrooms which are racially balanced within plus or minus 20% black. (Commw.Ex. 1018.) The extent of racial imbalance in the District's classrooms is .02 at the elementary level, .08 in junior high school, and .08 at the high school. (Commw.Ex. 1019.) Woodland Hills classrooms are more racially balanced than nearly all of the classrooms recently declared unitary in the Delaware school litigation (*Coalition to Save Our Children,* 90 F.3d 752 (3d Cir.1996)). (Commw.Ex. 1021.)

7. As of March 7, 2000, the percentage of African–American support staff in WHSD is 15.3%. The percentages for WHSD's nine schools was as follows: Edgewood Primary School, 29.4%; Shaffer Primary School, 7.1%; Wilkins Primary School, 11.7%; Dick-

(Commw. Ex. 1005, 1016; Tr. 4/11/00 at 59–60.) Likewise, support staff in every elementary school in WHSD is within plus or minus 15 percentage points of each school level's support staff percentage black, and support staff at half of the elementary schools are racially balanced at plus or minus 10 percentage points. (Commw. Ex. 1005 & 1016; Tr. 4/11/00 at 35, 60.)

Dr. Webb testified that the District's schools are not racially identifiable with respect to the distribution of staff.[8] ( Tr. 4/13/00 at 20.) Moreover, with 31% school building administrators African–American, WHSD has a respectable percentage of African–Americans in prominent leadership positions. (Commw. Ex. 1005; Tr. 4/11/00 at 61–62.)

African–Americans also currently hold leadership positions of significant authority and responsibility in the District's central administration, including Dr. Jacquelyn D. Webb, Assistant Superintendent for Curriculum; Dr. Roslynne Wilson, Assistant Superintendent for Management; Dr. Joel Reed, Curriculum Coordinator for Science and Math; and Dr. Elmer Haymon, Director of Guidance. (WHSD Ex. 22.) However, these positions are paid for through court-ordered funds, and the Dis-

trict has indicated, through its transition plan, that it will eliminate these positions when the Court's supervision ends. (Herman Tr. 4/3/00 at 135–36.)

The District's record with respect to hiring for the positions of principal or assistant principal shows that 25% of those positions are presently filled by African–Americans. ( WHSD Ex. 22.) Four of the District's nine schools have a total of five African–Americans in these positions, including Mary Frances Duncan, Principal of Shaffer Primary; Leah Saunders McCord, Principal of Fairless Intermediate; Dr. Deborah Vereen, Principal of East Junior High; Dr. Craig Jackson, Assistant Principal of East Junior High; and Clyde Jones, Assistant Principal of West Junior High. (WHSD Ex. 22.)

Dr. Rossell also compared the racial composition of WHSD's faculty and staff to the composition of school districts that have been declared unitary since 1986. She concluded that WHSD is one of the school districts that has achieved nearly perfect racial balance at plus or minus 10 percentage points. (Commw. Ex. 1005, 1015; Tr. 4/11/00 at 58–59.) [9]

Dr. Rossell's conclusions speak to the distribution of minority staff across the school district. The statistics showing the

son Intermediate School, 30.7%; Benjamin Fairless Intermediate School, 15.3%; Rankin Intermediate School, 11.0%; West Junior High School, 26.0%; East Junior High School, 11.1%; and Woodland Hills Senior High School, 10.2%. ( WHSD Ex. 13–21.)

8. As of February 25, 2000, the percentage of African–American faculty and professional staff in WHSD was 7.7%. (WHSD Ex. 23.) The percentages for the nine WHSD schools was as follows: Edgewood Primary School, 8.9%; Shaffer Primary School, 3.5%; Wilkins Primary School, 2.4%; Dickson Intermediate School, 11.7%; Benjamin Fairless Intermediate School, 15.3%; Rankin Intermediate School, 8.2%; West Junior High School, 10.8%; East Junior High School, 8.1%; Woodland Hills Senior High School, 5.7%. (WHSD Ex. 13–21.)

9. Several witnesses, including Dr. Rossell, compared WHSD with other districts where

unitary status has recently been granted, including the four districts consolidated in New Castle County, Delaware which are addressed in *Coalition to Save Our Children*, the only case in which the Court of Appeals for the Third Circuit has addressed motions for unitary status. We have considered such comparisons without losing sight of our need to carefully address the specific factual and procedural framework in which the Woodland Hills desegregation case has developed. Moreover, as we stated during the hearing, we are concerned only with whether the Woodland Hills School District has complied with our orders and eliminated the vestiges of discrimination to the extent practicable. In making this determination, a direct comparison with other school districts may indicate what they have found to be practicable, but otherwise has little relevance. (Tr. 5/10/00 at 63–64. )

District's overall percentage of minority professional staff, however, are dismal. As of February 25, 2000, the percentage of African–American faculty and professional staff in WHSD was 7.7%. (WHSD Ex. 23.)

Superintendent Herman and Dr. Jacquelyn Webb, Assistant Superintendent for Curriculum and Instruction, an African–American woman, testified about the efforts made in the District to recruit and hire African–American educators. (Tr. 4/3/00 at 156–59; Tr. 4/13/00 at 21–22.) WHSD undertakes a thorough process of advertising and recruiting to create a racially diverse pool of applicants for vacant faculty positions. (WHSD Ex. 25; Tr. 4/3/00 at 156–59.) Based on the testimony of Superintendent Herman and Dr. Webb, it is clear that WHSD's recruitment and hiring practices are not racially discriminatory, and the District has attempted to hire more minority professionals than it has actually succeeded in hiring. (Tr. 4/3/00 at 156–59; Tr. 4/13/00 at 21–22.)

Dr. Herman explained that 44% of the teachers presently in the District are holdovers who were teaching in one of the merger school districts when Woodland Hills was created in 1981, and that very few of the teachers in the newly merged District were African–American. (WHSD Ex. 23.)

*Conclusions of Law*

Courts addressing unitary status with regard to faculty and staff assignments, "typically have considered faculties within plus or minus 15 percentage points of the district-wide minority composition to be racially balanced." Recognizing the difficulty of achieving racial balance with small school faculties, "some courts have applied a standard of +20 percentage points." *Coalition,* 90 F.3d at 767, n. 21; *Flax v. Potts,* 915 F.2d 155, 163 (5th Cir.1990); *Reed v. Rhodes,* 1 F.Supp.2d 705, 727 (N.D.Ohio 1998).

This Court has never set forth a target percentage of minority hires in faculty and staff positions. Certainly 7.7% is not a very impressive figure, and we would hope that the District would continue its efforts to hire minority professionals. We are persuaded by the testimony of Dr. Herman and Dr. Webb that the District has complied with our order to desegregate faculty and staff assignments throughout the District to the extent practicable, and conclude that WHSD has achieved unitary status with respect to faculty and staff.

**Transportation**

*Findings of Fact:*

Transportation has not been an issue in this case since the earliest years of the newly consolidated school district. The 1990 R & R found that "the burden of transportation is shared to some degree by all students, as white students travel to schools in or near the minority community for grades 4–6, students from the former General Braddock district travel to schools in the white communities for grades K–3, and students throughout the District are transported to the Junior and Senior High Schools." (1990 R & R at 6.) We did not include transportation in the list of disparities still flowing from the *de jure* constitutional violation, nor have we ever found it necessary to address the issue as part of our remedial authority.

The evidence adduced at the hearing on unitary status confirms that transportation affects all students in the District. The pairing or clustering of elementary schools within the District assured from the outset that all students have to travel some distance to attend schools located outside of their neighborhoods during those years. ( WHSD Ex. 5, 6; Tr. 4/3/00 at 77–81.) In addition, virtually all students are bused to the junior and senior high schools.

Plaintiffs agree that the student assignment within the District provides for an equitable sharing of the burden of transportation. (Pls.' F & C at ¶ 43; Tr. 4/17/00, at 218).

*Conclusions of Law:*

■ A court may grant unitary status with regard to this Green factor when transportation is provided on a non-discriminatory basis. (*Coalition,* 90 F.3d at 768.) There being absolutely no dispute that the burden of transportation in the District has long been equally shared by all students, we find that the defendants have achieved unitary status on this issue and that no further Court oversight is needed.

## Facilities

*Findings of Fact:*

None of the District's nine institutional buildings is racially identifiable in its student population, and regardless of whether a school is located in an historically white or historically black community, the schools reflect no disparity in the quality of physical plant. (Tr. 4/3/00 at 147; 4/13/00 at 20.)

The 1990 R & R concluded that:

the District has also succeeded in upgrading its school facilities, most notably two elementary schools located in the minority community—Benjamin Fairless Elementary and Rankin Elementary. These two facilities were inherited from the General Braddock Area School District in somewhat neglected condition. They have been dramatically upgraded and expanded, providing the District as a whole and the minority communities in particular with a source of pride and confidence for the education of their children.

1990 R & R at 7.

The Hearing Officer also determined that as of 1990, the consolidation of the original three high schools into a single Woodland Hills High School, which was accomplished somewhat later than the consolidation of the elementary schools, not only gave the District its own identity, but "equalized the level of facilities and course offerings provided to all high school students in the District." (1990 R & R at 7.)

The Court's own visit to several of the District's schools, although certainly not an exhaustive inspection of the District's facilities, confirmed the trial testimony that the buildings are in admirable condition and that equal facilities and materials are available to all of the children regardless of which school they attend.

In addition to its buildings, the District has made a significant investment in computer networks and associated hardware and software. This investment was not pursuant to court order and was made without financial assistance from the Commonwealth. The computer resources are integrated throughout the District's instructional space. Superintendent Herman testified that WHSD's investments and resources in technology exceed those of many other school districts. (WHSD Ex. 39; Tr. 4/4/00 at 29–40.)

Defendants' expert Dr. Rossell analyzed per pupil expenditures for each of the District's nine school buildings, and visited all the schools herself. (Commw. Ex. 1005; Tr. 4/11/00 at 75–76.)

Dr. Rossell established that there is little difference in expenditures between the elementary schools that are located in predominantly African–American communities, and the elementary schools that were historically predominantly white, and what little difference there is favors the historically African–American schools. (Commw. Ex. 1005 & 1022; Tr. 4/11/00 at 76–77.)

Plaintiffs do not contest a finding of unitary status with respect to facilities, and agree that "the District has achieved desegregated, physically-sound buildings." (Commw. Ex. 1137; Pls.' F & C at ¶ 42.)

*Conclusions of Law:*

There being no dispute that the facilities in the Woodland Hills School District are desegregated, and that there is no disparity in the allocation of funds and expenditures for supplies and equipment between the historically black schools and historically white schools, we find that the defen-

dants have achieved unitary status in this area.

### Extracurricular Activities

*Findings of Fact:*

By 1990–91, the District had already taken a number of steps to increase minority participation in student activities in compliance with the Consent Decree. The 1990 R & R noted that the District had hired a full-time Activities Director, and had created advisory committees of students and parents. Significantly, the District had also implemented a "no-cut" policy for activities, so that all students, regardless of ability, have an opportunity to participate. (1990 R & R at 23.) Academic prerequisites to activities such as yearbook and student newspaper staff were eliminated. (Id. at 26.) In addition, the District provided bus transportation for children at the end of after school activities; this was of particular benefit to minority children because the secondary schools are located in predominantly white neighborhoods. (*Id.* at 23.) [10]

Nevertheless, we found significant racial disparities remaining in certain clubs and sports, as well as a "precipitous decrease in activities participation at the High School" level. (1990 R & R at 25–26.) While this was true for all high school students, minority student participation in activities declined by a far greater extent. (1990 R & R at 26.) We were also disturbed by the paucity of activities offered at the junior high schools. (1990 R & R at 26.)

The Court's assessment of the District's efforts to encourage minority participation in extracurricular activities was complicated by the fact that the District had failed to provide adequate data collection and reporting as agreed to in the Consent Decree. (1990 R & R at 24, citing Consent Decree at 40–41.)

In 1993 we ordered the District to hire an Activities Coordinator, who would coordinate activities within the secondary buildings, and would also monitor desegregation efforts and submit that data in monthly reports. (Pls.' Ex. 2109.) Kay Brown was hired to fill that position. Ms. Brown, who remains in that role, testified as a witness for the plaintiffs. She suggested that the District has made it difficult for her to do her job. (Tr. Kay Brown 4/27/00.) It is clear from her testimony that she and some in the District have often had conflicting views as to her position, and that she does not believe she has been supported by the Woodland Hills administration.

For more than a decade the District has maintained an "open enrollment/no-cut" policy so that all students, regardless of ability, have an unfettered opportunity to participate in matters that interest them. (WHSD Ex. 30; Tr. 4/3/00 at 164.) All school-sponsored extracurricular activities are conducted in a nondiscriminatory manner with equal access to every student. The activities are listed in WHSD's course selection guides. (WHSD Ex. 30; Tr. 4/3/00 at 164–65; Tr. 4/26/00 at 213–14.)

Today, the District offers a wide array of athletic and extracurricular activities. At the high school, there are 57 different activities; for ninth graders, there are 33 different activities; and for seventh and eighth graders, there are 21 different activities. (WHSD Ex. 26; Tr. 4/3/00 at 160.)

The District encourages all students to participate in extracurricular activities in a number of different ways. It actively recruits students through announcements, postings, and listings in course selection guides, among other efforts. (WHSD Ex. 30; Tr. 4/3/00 at 164–65.) WHSD has employed a full-time activities coordinator

---

**10.** Note that our Opinion and Order did not adopt the Hearing Officer's conclusion that transportation home from after school activities was a necessary part of the remedial program, and, on motion for clarification, we denied any remedy as to activities. This was overturned on appeal.

and established parent and student committees to promote activity participation. (WHSD Ex. 30; Tr. 4/4/00 at 164.) WHSD supplies uniforms for various ·activities, so that a student's personal finances need not stand in the way of his or her· participation. (WHSD Ex. 30.) Coaches and students from the high schools hold clinics and visit classrooms in the primary and intermediate grades to encourage activities participation. (WHSD Ex. 30; Tr. 4/3/00 at 165.)

WHSD also continues to provide extensive after-school transportation for students participating in activities. WHSD receives no reimbursement pursuant to any Court order in this case for activities transportation. (WHSD Ex. 27, 30; Tr. 4/3/00 at 162, 164.)

The sole eligibility criteria for activities in WHSD is an academic standard. Students who lose eligibility for activities due to substandard academic performance may restore their eligibility by attending tutoring sessions. (WHSD Ex. 30; Tr. 4/3/00 at 165.)

At this point in time, plaintiffs apparently do not dispute that WHSD's extracurricular activities are open to students regardless of race or ability. (*See* Pls.' Opp'n to Mots. for Unitary Status, at 23–24.)

Dr. Rossell analyzed data regarding student participation in extracurricular activities. (Commw. Ex. 1005; Tr. 4/11/00 at 78.) She concluded that the rate of participation by African–American students in extracurricular activities is proportionate to their enrollment rate at each school. (Commw. Exs. 1005, 1023–A & 1023–B; Tr. 4/11/00 at 78–79, 82–83.)

Dr. Rossell testified that of the numerous clubs and sports activities with more than one student involved, only five have no black students at all. Those activities are diving, ice hockey, Spanish Club, Teens for Teens, and Math Club. All other activities have substantial numbers of black students. In addition, there are no

all-black activities. All activities have white students participating in them and all but a handful have both races participating. (Commw. Ex. 1005; Tr. 4/11/00 at 81. )

Plaintiffs' expert Dr. Gordon testified that at times activities' sponsors do not report student participation data as they are required to do. (Tr. 5/4/00 at 204.) Ms. Brown, as well, testified that activity sponsors sometimes resist compliance with this part of the Court's orders. (Tr. 4/27/00 at 193.) While we do not discount this testimony, we conclude that, overall, the District has done an effective job of encouraging minority students to participate in extracurricular activities, and of facilitating that participation.

There are no barriers to activities participation for African–American students in WHSD. Participation, however, is voluntary, and students may choose not to participate in extracurricular activities for various reasons, including responsibilities and pressures outside of school. (Tr. 4/3/00 at 168–69.) As Guidance Director Dr. Elmer Haymon testified, these outside responsibilities or pressures are borne disproportionately by African–American students. (Tr. 4/26/00 at 147–49.) We have reviewed the Monthly Activity Reports and selected student interview forms, and observed that students give a wide variety of predictable reasons for dropping out of a particular activity. (Pls.' Ex.2001.) Although the occasional student complains about problems with transportation or sponsor insensitivity which may indicate racial bias, as recounted in Ms. Brown's testimony, the vast majority of students interviewed explain that they no longer wish to participate because they have joined another activity, need more time for their homework, have an after school job, or have other responsibilities that conflict with extracurricular activities. (Pls.' Ex.2001; Brown Tr. 4/27/00 at 82.)

*Conclusions of Law:*

██ "A school district's extracurricular activities are unitary if they 'are available

to all students within the School District regardless of race.'" *Coalition,* 90 F.3d at 768–69 (quoting *Singleton v. Jackson Mun. Separate School Dist.,* 541 F.Supp. 904, 908 (S.D.Miss.1981)). To achieve unitary status, school districts are not required to show that majority and minority students within the district participate equally. *Coalition,* 90 F.3d at 769 (citing *Quarles v. Oxford Mun. Separate School Dist.,* 868 F.2d 750, 757 (5thCir.1989)). Where a school district shows that it has eliminated invidious racial distinctions, that may be a sufficient remedy. *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 18, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The Constitution does not require racial balance of every extracurricular activity to match the racial balance of the school system. *See Coalition,* 90 F.3d at 768–69 ("we cannot . . . expect a school district to compel or deny student participation in non-compulsory extracurricular activities merely to effect a racial balance").

The District has shown that it has made its activities available to all students, and that it has done everything practicable to encourage minority students to participate in the wide range of sports and activities it offers to its secondary school students. Thus, we find that the District has achieved unitary status as to student activities, and we will relieve the defendants of further court-ordered supervision and funding in this area.

### Ancillary Relief

Having found that the District has achieved unitary status on each of the Green factors, we must now determine whether WHSD has complied, to the extent practicable, with the ancillary remedies we have ordered. The 1990 R & R found racial disparities in the broad areas of curriculum and educational programs, and discipline and guidance, and we ordered staff development as well as specific remedial and compensatory programs targeted at these disparities. We also ordered that the District hire an Evaluator to monitor compliance with these court-ordered remedies, and that it fund independent outside studies where necessary. The relief ordered in our 1991 Opinion and Order was affirmed by the Court of Appeals for the Third Circuit by unpublished opinion dated September 21, 1992.

In 1996, the District submitted its Remedial Plan for the school year 1996–1997, and we referred objections to the plan to Special Master Mark Fatla. After five days of hearings, the parties were able to reach agreement on most of the disputed issues, including summer programs, staff development, remedial instruction, and a budget. That agreement was approved by the Court in an Order dated September 27, 1996.

The difficult issue of discipline and guidance, however, remained unresolved. A hearing was held by the Special Master, whose Report and Recommendation was adopted by the Court by Order dated June 15, 1997.

We note that in more recent years, under the supervision of the Special Master, the parties have admirably been able to reach agreement on most of the court ordered remedial programs, as well as on the budget that supports their implementation.

With this procedural background in place, we will consider the District's compliance with the ancillary relief we have ordered. We realize, of course, that these are not always separate and discrete categories, and that each has a strong effect on the others.

### Curriculum and Assessment

*Findings of Fact:*

We ordered the District to redesign its curriculum so as to provide an equal education to all students in heterogeneous, detracked classrooms, measured by appropriate assessments, and supported by a wide variety of remedial, compensatory programs.

*(i)*

At the time of the merger, each of the component districts structured its curriculum on a "tracking" plan, such that children were grouped in homogeneous classrooms of high, average, or low achievers. In such a system, the fast track students are consistently challenged to push the limits of their knowledge and ability, and thus progress faster and learn more than their counterparts. On the other hand, those perceived to be low achievers are given instruction focused on basic low level skills, with little exposure to problem solving or to higher order thinking skills. Tracking has a strong impact on minority students, who generally make up a high percentage of students in lower level courses, and it contributes to an achievement gap between black and white students. (1990 R & R at 31.)

By 1991, WHSD had eliminated tracking in the elementary grades by grouping children of various levels of perceived ability together in heterogeneously grouped classrooms. (1990 R & R at 32.) However, tracking still existed at the junior high and high school levels, and contributed, in part, to the significant racial disparities found in advanced level courses. (1990 R & R at 33.) Minority students tended to be concentrated in standard courses, while being virtually absent from advanced level courses throughout the curriculum. (1990 R & R at 36.)

We found this stratification to be "the most critical disparity in the system because it is a direct measure of the educational deprivation suffered by minority students as a direct result of the formerly segregated system." (1990 R & R at 36.)

The significant racial disparity in advanced courses was particularly evident in science and mathematics. (1990 R & R at 33.) In particular, we found that a vestige of discrimination due to tracking remained in the secondary school math sequence, which offered pre-algebra as the entry point for upper level math courses. Pre-algebra was offered to students in grades 7 through 10. A student taking pre-algebra in the 7th or 8th grade, could then progress through the sequence of courses in algebra, geometry, and calculus. However, the child taking general math courses in 7th, 8th, and 9th grades, instead of pre-algebra, was unable to progress through the entire math curriculum. (1990 R & R at 35.)

The 1990 R & R concluded that "curriculum redesign is the framework upon which all other desegregation efforts rely." (1990 R & R at 79). Therefore, we ordered the District to undertake a broad and comprehensive review of course structure, content, sequence, objectives, interdisciplinary relationships, multicultural focus, instructional materials, and testing materials. (1990 R & R at 79). Our Order included directing the District to hire an Assistant Superintendent for Curriculum and Instruction, two Curriculum Coordinators, and nine building level coordinators, and to use outside consultants as necessary. (1990 R & R at 81; 1991 Order at ¶ 1D.)

*(ii)*

In compliance with the Court's orders, several employees have been hired to facilitate the curriculum redesign effort, including the Assistant Superintendent for Curriculum and Instruction Dr. Jacquelyn Webb; two Curriculum Coordinators, one for Language Arts and Humanities, Dr. Stefan Biancaniello, and the other for Math and Science, Dr. Joel Reed, each of whom testified on the curriculum at the hearing on unitary status; and nine building-level Clinical Supervisors. (Tr. 4/4/00, at 73–75.)

*(iii)*

In January of 1993, we ordered the District to contract for a curriculum audit, to ascertain *inter alia,* whether the redesign of the curriculum and testing had eliminated stratification and tracking. (Tr. 4/10/00, at 5.) We emphasized that the curriculum should "ensure equal academic access and opportunity for African–Ameri-

can students." (Order dated Jan. 5, 1993, attach. A, ¶ 12.)

Following the audit, the District developed a plan for curricula revision over a six-year period. (Tr. 4/4/00, at 81–2.) The results of the audit and development of the curriculum redesign plan coincided with the arrival of Dr. Stanley Herman as the Superintendent of the District. In most respects, the changes in the District's curriculum under Dr. Herman's leadership are impressive.

One of the audit's findings was that the instructional program in one elementary school differed from what was being offered in another school. Dr. Herman testified that the District now has horizontal alignment, so that the curriculum, opportunities, and resources in one third grade classroom, for example, are also part of the third grade classrooms in the other elementary schools. (Tr. 4/4/00, at 94.) WHSD also has vertical alignment of the curriculum, so that what is taught in the second grade builds upon what was taught in the first grade. (Tr. 4/4/00, at 94.)

In Pennsylvania, the School Board is responsible for the school district's curriculum; the WHSD Board of Education has a written policy on curriculum development. (WHSD Ex. 55.) By the end of the current school year, 1999—2000, every course guide will have been rewritten at least once since 1993, with the exception of pre-algebra, which has not been rewritten because it is slated to be eliminated from the District's curriculum. (Tr. 4/4/00, at 89; 4/25/00, at 123–25.)

In revising its curriculum, WHSD observed the following standards: heterogeneously grouped classrooms; district-wide unified plans; cultural diversity and multicultural education; elimination of tracking and stratification; higher order thinking skills and problem solving; supplemental resources for various students, inclusion of objectives, resources, and teaching techniques; and consistency with state regulations. (Ex. WH 52; 4/25/00, at 127–28.)

The testimony established that WHSD offers an extraordinary variety of courses in the secondary schools for a district of its size, (Tr. 4/13/00, at 27), and that cultural diversity and multicultural education are an integral part of the WHSD curriculum. (Tr. 4/13/00, at 23.) Dr. Herman testified that curriculum in the District is now written on the assumption that all students are being taught in heterogeneous classrooms. (Tr. 4/4/0, at 93.) Ten new courses are being developed for the 2000–2001 school year. (Tr. 4/4/00, at 89.) Various curriculum initiatives are in place at the elementary and secondary schools, including the 25–book reading challenge, portfolio assessment, read alouds, Questioning the Author, and Connected Mathematics. (Tr. 4/17/00, at 18–20.)

An important element of the curriculum redesign is the District's investment in computer technology, an initiative undertaken by WHSD without funding from the Commonwealth. Computer-assisted instruction has been integrated at all levels, and the resources are available to students of all races and achievement levels on an equal basis. (Ex. WH 39; Tr. 4/4/00, at 29–43.)

The District has also put in place a thorough process for selecting appropriate textbooks for a multicultural curriculum. Committees comprised of teachers, administrators and community members review and recommend textbooks for approval by the Board. (Ex. WH 55, Tr. 4/4/00, at 86–88.)

### (iv)

Related to the curriculum redesign, WHSD underwent a strategic planning process from 1994 to 1996, and the WHSD Board of School Directors adopted the Strategic Plan in October 1996. Parents and members of the Plaintiff class participated in the planning process. A summary of the Strategic Plan was mailed to 6,000 homes in the school district before its adoption. (Exs. WH 8, WH 11; Tr. 4/3/00, at 82, 90.)

A product of the strategic planning process was WHSD's Mission,[11] Vision [12] and Beliefs Statements [13], which were adopted by the Board on September 13, 1995. These statements are prominently displayed throughout the schools. (Ex. WH 12; Tr. 4/3/00, at 92–93.)

Several witnesses testified that WHSD's personnel are committed to the Mission, Vision and Beliefs Statements. (Tr. 4/3/00, at 94; Tr. 4/17/00, at 28, 131; Tr. 4/25/00, at 120.)

*(v)*

The written and taught curricula are but two sides of the curriculum triangle. The third component, the assessed curriculum, is also necessary as a means of measuring how well what is being taught is actually being learned. (WHSD Ex. 51; Tr. 4/4/00, at 72–3.) Assessments must be carefully aligned with the curriculum. These three elements are so interrelated that, if one is changed, the other two are likely to be affected as well. (Tr. 4/4/00, at 196.)

The District has in place various measures to assess student performance, including standardized tests (Iowa Tests of Basic Skills, Stanford 9, New Standards Reference Exams, Pennsylvania System of School Assessment tests), Computer Curriculum Corporation ("CCC") data, internal assessments developed by textbook publishers, peer assessment, portfolio assessment, walk-throughs, administrator's binders and teacher tests. (Ex. WH 74; Tr. 4/4/00, at 190–95.)

WHSD's central administration directs building principals to base their decisions on multiple sources of data, including standardized test scores, New Standards Reference exam scores, classroom observations, computerized assessments of student performance, and other sources. (Tr. 4/4/00, at 23.)

11. WHSD's Mission Statement reads as follows:

> The Woodland Hills School District will provide each student with knowledge, understanding and an appreciation of the diverse global community; the wisdom to participate as productive and caring leaders; and a passion for life-long learning. In preparation for the 21st century, our schools will challenge our students to set ambitious goals and to achieve them without fear of failure. This mission is accomplished through the active, cooperative efforts of the home, school and community. (WHSD Ex. 7.)

12. WHSD's Vision Statement reads as follows:

> We envision the Woodland Hills School District as a dynamic, adaptable and united educational community which
> - empowers students with the strengths, skills and perseverance to achieve their goals;
> - accepts, celebrates and appreciates individuality and diverse backgrounds; and
> - produces students who have the knowledge and wisdom to become productive and valued citizens of the local and global communities. (WHSD Ex. 7.)

13. The Beliefs Statement of WHSD reads as follows:

- All students can learn and are capable of achieving high standards.
- Effective schools encourage all students to accept challenges as positive learning experiences.
- The best schools encourage a love of life-long learning and the development of self-esteem.
- Students are motivated to learn when they can apply what they have learned to their lives.
- An effective curriculum promotes understanding and appreciation of all people and cultural backgrounds.
- Student success is best achieved through the cooperation of home, school and community.
- Students learn best in safe and orderly places.
- All students must become productive participants in the local and global communities.
- Student pride in self, school and community will strengthen the Woodland Hills community.
- Student participation in extra-curricular activities is an important component of a well-rounded education.
- Ongoing staff development and training is essential to maintain a quality educational program.
- Diversity is our strength. (WHSD Ex. 7.)

In accordance with the Court's order to contract with outside consultants as necessary, to ensure that testing is designed to be consistent with the revised curriculum, the District contracted with the Learning Research and Development Center's ("LRDC") Institute for Learning in the fall of 1997. The Institute has advised WHSD on issues of assessment and staff development, and several members of the District have been trained as Institute fellows. (Tr. 4/4/00, at 140–.51; 4/10/00, 157–58; WHSD Ex. 64, 65.)

The District has acquired and distributed the New Standards Performance Standards, and has conducted staff development workshops on the implementation of this program. New Standards was developed and marketed by the Learning Research and Development Center ("LRDC") at the University of Pittsburgh, and by the National Center for Education and the Economy ("NCEE"). (Tr. 4/4/00, at 106–9.) The District entered into the relationship with LRDC and adopted the New Standards assessments as one means of fulfilling the Court's order to detrack the curriculum and move all students to higher order thinking skills. (Tr. 4/10/00, at 176.) Staff development on New Standards remains incomplete. (Tr. 4/10/00, at 178–180.)

*(vi)*

In connection with the curriculum redesign, the District complied with the court-ordered remedy and eliminated tracking in the Language Arts curriculum in the Junior High Schools as well as in the standard English offerings in the High School.[14] (Tr. 4/4/00, at 98–100.)

However, independent outside evaluators, retained by the parties to review the District's progress in detracking during the 1995–1996 school year, suggested that tracking remained in the Science and Math curriculum.[15] ( Plfs.' Ex.2089, Oakes–Welner Report at xv, 18–29, 105, 126–128, 164.) With respect to the curriculum generally, the Report concluded that African–American students remained under-represented in the most challenging classes and over-represented in less challenging courses, at both the high school and junior high school levels. (Plfs.' Ex.2089 at 105.) An independent post-audit, conducted in 1997, determined that a number of the District's courses still needed to be revised. (Pls.' Ex.2023.)

Dr. Herman defined detracking as having only one curriculum for any given course, and testified that no tracked classes are offered in the District. He used biology as an example, stating that there is only one biology curriculum. (Tr. 4/4/00, at 93.) The District has persuaded

14. The English curriculum offers a fine example of successful detracking. In 1994–1995, the District offered basic English and academic English tracks in grades 7 through 12. The low level basic track has since been eliminated, and all students now study a curriculum that includes literature from many different cultures, requires increased writing, and assesses students' progress through the use of portfolios. Dr. Herman testified to strong objections from many white parents as well as from a number of teachers when this new program was implemented. Now, however, nearly all of the English teachers would agree that the heterogeneous classes have not hindered the higher achieving students, and that the students who would have been in the lower level classes are performing at higher levels. (Tr. 4/4/00, at 94–98; 4/10/00, at 40–41, 55–60).

15. We are aware that Oakes and Welner also expressed the opinion that the District's simultaneous expansion of the Advanced Placement Language Arts offerings actually had the effect of recreating ability grouping. (Pls. Ex.2089A, Oakes/Welner Report at xi.) Plaintiffs' expert witness Dr. Fashola reached a similar conclusion that AP courses indicate a tracked curriculum. (Tr. 5/1/00, at 145.) However, testimony at trial established that these courses do not represent tracking in the traditional sense, and we do not see this as a vestige of discrimination. Furthermore, we think it important to remember that Woodland Hills sends a fair percentage of its graduates on to colleges and universities which value, and may even require, AP credits. The District would not be providing those students with the education they need if AP courses were not available.

us that offering biology with or without a laboratory component is not tracking, but rather is necessary to accommodate the schedules of those students in the vocational education program. (Tr. 4/10/00 at 36.)

However, our remedy on curriculum revision has always emphasized that offering academic and basic courses, within the same subject area, is a form of ability grouping that provides the children enrolled in the more academic classes with a more rigorous education and prepares them for more advanced coursework. Students enrolled in the more basic courses do not have these same opportunities. Dr. Herman later admitted that the math curriculum in the secondary schools has not been fully detracked, but stated that it would be once PUMP Algebra and the cognitive tutor programs are in place. (Tr. 4/10/00, at 61.)

The math curriculum in grades K through 8 has been rewritten at least once under the Court-ordered remedy. (Tr. 4/4/00, at 114.) With the exception of pre-algebra, the secondary curriculum has also been rewritten since 1993. (Tr. 4/10/00, 62.) However, the sequencing of math courses in the current curriculum suggests to the Court that tracking continues in this limited area. At present, the seventh grade course selections in mathematics present a choice of mathematics 7, pre-algebra, or algebra. (Pls.' Ex.2029; Tr. 4/10/00, at 66.) The entry point for upper level math courses remains the same as it was in 1990—pre-algebra. Despite the fact that we have consistently ordered detracking in the math curriculum as part of the remedy, the District has not, in our opinion, detracked the courses in this important academic area.

A student enrolled in pre-algebra in the 7th or 8th grade is subsequently able to progress through the academic sequence of algebra, algebra II, geometry, and calculus, and then, if the student wishes, to proceed to trigonometry as well as other advanced math courses. Students who enroll in the basic mathematics 7 course, however, do not have that same opportunity. The Court finds it significant that, in the math curriculum as presently constructed, students may enroll in pre-algebra in 7th grade or as late as 11th grade.

Plaintiffs' experts Dr. Olatokunbo Fashola, an associate research scientist at Johns Hopkins University; Dr. Jan de Leeuw, chair of the Department of Statistics at UCLA, Dr. Robert Cooper, a research scientist and professor at Johns Hopkins University, and Dr. Lea Hubbard, an educational researcher at the University of California at San Diego, each testified that tracking is still present in the District's curriculum and operates to disadvantage African–American students. However, in reaching our conclusion that tracking remains to be remedied in mathematics, we are persuaded more by the defendants' evidence than by the plaintiffs' witnesses, and we do not adopt their opinions on this subject.

Curriculum revision in any school district is an ongoing process. It appears that the District has several forthcoming revisions to the WHSD math curriculum that, once implemented, may be expected to remedy this remaining area of concern. Dr. Herman testified that a program known as Connected Mathematics is gradually being incorporated into the math sequence in 6th, 7th, and, possibly, 8th grades. (Tr. 4/4/00, at 113–14; 4/10/00, at 61–63.) During the 2000–01 school year, the District will revise the K to 6 curriculum again, select a new K to 5 math series, and implement Connected Mathematics at grade 6. (WHSD Ex. 53; Tr. 4/4/00 at 115.)

The District expects that Connected Mathematics will be fully implemented in the 7th grade in 2001–02, and, at that point, pre-algebra will no longer be offered as a separate course. (Tr. 4/4/00, at 116.) Connected Mathematics may also be part of the 8th grade curriculum in the year 2002–03. (Tr. 4/4/00, at 116.) The District also anticipates that at that point all eighth

grade students will take algebra. (Tr. 4/10/00, at 62.)

Dr. Herman testified that a computer assisted program known as the cognitive tutor algebra program, also known as PUMP Algebra, will be online for students beginning in September of 2000. (Tr. 4/4/00 at 110–11.) Again, all students will use this form of instruction.

*Conclusions of Law:*

 After considering the record evidence and testimony on curriculum and testing, we conclude that the District has complied with our remedial orders in most respects. The District has hired appropriate staff, including an Assistant Superintendent for Curriculum and Instruction, Curriculum Coordinators, and building level coordinators (clinical supervisors); and has contracted with outside consultants as necessary to ensure that testing is planned and designed to match or be consistent with the curriculum to date. The high school administration makes all courses open to all students, and ensures that courses with multiple sections are balanced by race and gender to the extent practicable. The secondary school guidance counselors encourage African–American students to enroll in so-called higher-level courses.

The District has complied with our order to redesign the curriculum and to eliminate tracking in all areas except mathematics. The evidence is clear that the secondary school mathematics curriculum has not been detracked. Therefore, Woodland Hills has not yet completed the transition from homogeneous classrooms to multicultural, heterogeneous instruction.

The District is, however, well on its way to doing so. Testimony at the hearing on unitary status showed that the District expects to complete the remaining curricular revisions within a three-year timeframe, and that as a result every student will receive the same education in mathematics through algebra I.

Woodland Hills High School offers a rich selection of courses in math as well as in other disciplines, and we would expect high school students to choose between these courses depending upon an individual interest in various disciplines and their future academic and employment plans. These are personal decisions, to be made in consultation with parents, teachers, and counselors. When the math curriculum at the secondary school level has been fully detracked all students will be prepared to take advantage of the District's upper level courses.

Accordingly, despite its impressive progress in most areas of the curriculum, we conclude that the District has not achieved unitary status as to its curriculum, assessment, and instruction because it has not detracked the mathematics curriculum. We will continue our supervision of the implementation of the District's anticipated revisions to this curriculum, as well as of the corresponding development and implementation of appropriate assessments, and related staff development.

Curriculum redesign under our orders has been led by court-ordered staff with clerical support. As we have found that the District has not achieved unitary status in this area, it is clearly too early to terminate any of these positions. Furthermore, staff development in standards-based instruction and in corresponding assessments, remains to be done, and these individuals are a key element to such training. As part of our ongoing remedy for curriculum and assessment, we will adopt that portion of the District's Transition Plan which is specifically concerned with these factors and will authorize the District to implement this three phase strategy. (WHSD Ex. 87 at 10–13.)

**Special Education**

Although the 1990 R & R found that "serious and alarming racial disparities" existed in the District's Special Education programs (1990 R & R at 39), and we ordered the District to take a number of remedial steps, this is no longer a contest-

ed issue in this case. (Tr. 4/17/00 at 216–17.) The Court is satisfied that the defendants have achieved unitary status as to special education.

### Remedial and Compensatory Programs

*Findings of Fact:*

Much of the hearing testimony focused on the racial disparity in academic achievement in the Woodland Hills School District, including an achievement gap in scores on national standardized tests. Plaintiffs contend that this gap is evidence that the District has not attained unitary status and that continued Court supervision over its academic and remedial programs is necessary.

We have been concerned about this disparity since our 1991 Opinion and Order, which concluded that differences in academic achievement between African–American and white children were causally related to the constitutional violation. (1991 Opinion at 4.) At that time, we ordered the District to implement, and the Commonwealth to fund, a wide variety of remedial compensatory programs, beginning at the kindergarten and elementary levels, to target this disparity in achievement. Indeed, we concluded that the compensatory programs were necessary to remedy the educational disadvantages African–American children had endured as a result of segregated schooling, and to provide the additional academic support these children were likely to need in order to thrive in an detracked, heterogeneous classroom. (1990 R & R at 67; 1991 Opinion & Order at 5.)

*(i)*

The compensatory programs ordered in 1991 were tutoring labs in mathematics and language arts in the secondary schools, staffed by full-time leaders; Reading Recovery for grades 1—3; the Higher Order Thinking Skills ("HOTS") program for grades 4—6; after school tutorials for grades 4—6; and summer programs including a K—6 summer school program, and a K—3 summer learning program. (1991 Order at 2–3.)

With certain adjustments, these programs have been part of the court-ordered remedy since 1991. While we agree with the plaintiffs that the defendants have on occasion been guilty of foot-dragging in implementing and funding some of these compensatory programs, plaintiffs did not offer any evidence that the District is not currently operating the various compensatory educational programs in full compliance with the Court's orders.

WHSD presently operates after-school tutorial sites in school buildings, as well as in several locations in historically black neighborhoods, including the Braddock Library, the Hawkins Village Housing Project, the Prospect Terrace Housing Project and the Rankin Christian Center. These tutorials provide extra academic assistance to students, and are particularly useful because they are accessible to the minority children who are the primary target of the remedy.[16] (Ex. WH 35, Tr. 4/4/00, at 5, 9–10.)

Since the 1991–92 school year, WHSD has maintained the HOTS Program for a limited number of students in grades 4-6. This program is intended to increase the critical thinking skills of students identified for inclusion. (Exs. WH 35, 60; Tr. 4/4/00, at 5, 11–13.)

To assist students with math and language arts, WHSD offers compensatory laboratories in those subjects at the two junior high schools. (Tr. 4/4/00, at 5–6.)

To improve reading skills, the District operates a Reading Recovery program for selected first graders. The District was extremely slow in implementing this program; initially, Reading Recovery was operated in only one primary school, but beginning in the 1998–99 school year, the program was finally expanded to all three

---

**16.** In the case of the after-school tutorials and the other compensatory educational programs, the Commonwealth contributed funds for 90% of the costs.

primary schools. (Ex WH 35, 60; Tr. 4/4/00, at 6.)

Since the 1990–91 school year, WHSD has offered a summer enrichment and summer learning program for students in grades K–6. (Exs. WH 35, 60; Tr. 4/4/00, at 10–11.) WHSD has recruited African–American students likely to benefit from the program. (Tr. 4/4/00, at 11.) Summer programs for teachers and for students were cancelled during 1999 due to a labor dispute.

Academic supports provided at the intermediate schools include HOTS and the community tutorials. These supports are offered and available equally to white and African–American students. (Tr. 4/17/00, at 24.)

To better prepare incoming kindergartners, WHSD has operated the KIDS program of diagnostic pre-school services. (Exs. WH 35, 60; Tr. 4/4/00, at 10.)[17]

*(ii)*

Yet despite the implementation of these remedial programs, and despite the fact that the District has made significant progress in curriculum revision and detracking, which are the other components of our remedial order on educational programs, a racial disparity remains glaringly evident in achievement test scores.

We must emphasize that neither the 1990 R & R nor our 1991 Opinion and Order directly addressed any racial disparity in test scores. As far back as the Consent Decree, the Court's concern has always been with identifying educational deficiencies resulting from unequal and segregated schools—the constitutional violation—and with ordering an end to ability grouping, a restructuring of the curriculum, and a variety of compensatory programs to remedy these skill deficiencies. The Consent Decree contemplated a focus on students' individual skills, and indicated that achievement tests should be used as one of the means of evaluating an individual student's skills and progress. (Consent Decree at 7–8.)

Students diagnosed with individual deficiencies in basic skills were to be offered compensatory and remedial instruction. (Consent Decree at 8.) Therefore, as part of the remedy for the constitutional violation, we ordered the District to implement a number of specific programs, which it has done. We did not address the ultimate means by which we would evaluate the success of any of these programs, nor did we express an expected degree of correlation between their success and a reduced disparity in test scores.

*(iii)*

What if the District implements the educational reforms as ordered, yet a racial disparity in academic achievement clearly remains? Recent Supreme Court jurisprudence has addressed this scenario, directing that the courts decide whether a defendant has complied "to the extent practicable," which anticipates something less than total success, and allowing defendants to introduce evidence of external circumstances to account for the remaining disparity. *Freeman,* 503 U.S. at 494, 112 S.Ct. 1430.

This the defendants have done, primarily through the analysis and testimony of Dr. David Armor, research professor at the Institute of Public Policy of George Mason University, and an expert in school desegregation, specifically in the area of student achievement. (Commw. Exs.

---

**17.** In addition to the court-ordered remedies now in place, the District is playing a significant role in the Greater Braddock Early Childhood Initiative ("ECI"), which gives at-risk pre-schoolers in the District a better foundation for school. (Tr. 4/13/00, at 29–37.) Almost one third of the 5,800 Allegheny County children who are eligible for Head Start but are currently unserved by the program, reside within the school district. (Tr. 4/4/00, at 128.) Dr. Herman serves on the board of directors for ECI, and the educational programs provided through the Initiative are coordinated with WHSD's curriculum, so that children are able to make a smoother transition from one of the Initiative's sites to WHSD's schools. (Tr. 4/3/00, at 64.)

1031, 1032; Tr. 4/25/00, at 8.) Dr. Armor convincingly demonstrated that the differences reflected in standardized test scores for African–American and white students in the District are not based on racial discrimination in the schools but rather are the result of socioeconomic factors, including poverty. Dr. Armor's conclusions are supported by decades of social science research, and his education and experience as a sociologist give him the knowledge necessary to interpret achievement data and give meaning to the results of his regression analysis.

Dr. Armor evaluated the academic achievement of students in the District to determine whether any vestiges of past segregation remain. (Commw. Ex. 1031; Tr. 4/25/00, at 9–13.) To do so, he compared average Iowa Test for Basic Skills ("ITBS") scores for black and white students in reading and math. Dr. Armor also compared ITBS scores for black and white students at various grade levels with the same students' first grade and kindergarten ITBS scores. Finally, he compared the ITBS scores for blacks and whites taking into account each students' participation in the free or reduced lunch program. (Commw. Ex. 1031; Tr. 4/25/00, at 12–13.)

Dr. Armor included early test scores and free lunch participation as variables in his regression, because those are valid measures of socioeconomic factors for children in the District. Kindergarten and first grade scores reflect the students' skill level as developed under conditions in the students' homes and communities and without influence from the schools. Free lunch status is a commonly used indicator of poverty. (Tr. 4/25/00, at 78.)

Socioeconomic factors and family background have been widely recognized as influential in students' academic performance.[18] (Tr. 4/25/00, at 13–16.) Differences in the socioeconomic backgrounds of black and white students are reflected nationally in an achievement gap. This gap appears at all ages in virtually every school system throughout the United States in reading, mathematics and science. A comparison of national scores on achievement tests highlights this disparity. (Commw. Ex. 1031; Tr. 4/25/00, at 17.)

Taking socioeconomic factors into account, Dr. Armor found that the achievement gap between black and white students in the WHSD is somewhat smaller than the national achievement gap.[19] (Commw. Ex. 1033; Tr. 4/25/00, at 11, 20–21.)

When the effects of poverty and first-grade or kindergarten tests scores are removed, the remaining or unexplained portion of the achievement gap is very small. (Commw. Exs. 1031, 1034, 1035; Tr. 4/25/00, at 26–27.)

In 10 out of 12 analyses (reading and math for six grade cohorts), the residual achievement gap between black and white students is not statistically significant.

---

**18.** Plaintiffs' witnesses, Drs. Hubbard and de Leeuw, agreed that socioeconomic factors are influential factors in students' academic success. (Tr.5/2/00, at 26–28, 129–31; Tr. 5/3/00, at 129.)

Dr. Hubbard admitted that research shows students from disadvantaged backgrounds often have academic and behavioral problems, and that the real source of inequality between the races lies in socioeconomic conditions and society at large, not in the school. (Tr. 5/3/00, 116, 137–38, 141.)

Also, Dr. Cooper acknowledged that family problems may place students at risk for poor attendance, underachievement and behavior problems. (Tr. 5/4/00, 103–04.)

**19.** Dr. Armor also demonstrated that the size of the residual achievement gaps found in WHSD are similar to or smaller than those found in other analyses he has carried out in connection with unitary hearings, including three school systems that have been declared unitary with respect to achievement—New Castle, Delaware; Hillsborough County, Florida; and Charlotte–Mecklenburg, North Carolina. (Commw.Ex. 1031.) Given the fact-specific nature of unitary status cases, however, we note this comparative data without according it undue weight.

(Commw. Ex. 1031, 1036; Tr. 4/25/00, at 26–27.)

In the two cases where the unexplained achievement gap is statistically significant, Dr. Armor demonstrated that the achievement gap is caused by unmeasured family background differences that continue to operate as a child moves through school. (Commw. Ex. 1031, 1036; Tr. 4/25/00, at 26–27.)

*(iv)*

In preparing his report, Dr. Armor relied in part upon socioeconomic data prepared by Dr. Vijai B. Singh, Associate Chancellor and Professor of Sociology at the University of Pittsburgh, who testified as an expert for the defendants in socioeconomic and demographic data.[20] (Commw.Ex. 1089.)

Dr. Singh reported stark differences between the socioeconomic circumstances of the African–American and white residents of the Woodland Hills School District. His data shows that:

- 46.5% of the students enrolled in WHSD in the 1997–98 school year were from low-income families. (Commw. Exs. 1089, 1099 & 1116; Tr. 4/17/00, at 168–69.)

- The rate of unemployment for blacks in the WHSD area was almost three times the rate of unemployment among whites (16% compared to 5.8%). (Commw. Exs. 1089, 1093 & 1110; Tr. 4/17/00, at 163.)

- The number of black households in WHSD with incomes below $25,000 was one and a half times greater than the number of white households. (Commw. Exs. 1089, 1094 & 1111; Tr. 4/17/00, at 164–65.)

- In 1989, 41% of blacks and 14.6% of whites in WHSD were living in poverty, defined as an income below $12,674 for a family of four. In other words, there were almost three times as many black families with children living in poverty as white families. (Commw. Exs. 1089, 1095 & 1112; Tr. 4/17/00, at 166.)

- The rate of blacks without high school degrees was 1.38 times that of whites. (Commw. Exs. 1089, 1098 & 1115; Tr. 4/17/00, at 167–68.) The rate of bachelor's degrees among whites was three times greater than the rate among blacks. (Commw. Exs. 1089, 1107 & 1125; Tr. 4/17/00, at 175–76.)

- The rate of single-parent families among blacks was 3.35 times that of white families. (Commw. Exs. 1089, 1100 & 1117; Tr. 4/17/00, at 169.)

- Between 1993 and 1995, the average rate of teen-age pregnancies among blacks in WHSD was almost 6 times greater than the rate among whites (57.45 per thousand compared to 9.90 per thousand). (Commw. Exs. 1089, 1101 & 1118; Tr. 4/17/00, at 170–71.)

- On average between 1995 and 1997, the rate of live births to single mothers for blacks was almost 3 times that of white mothers. (Commw. Exs. 1089, 1103 & 1120; Tr. 4/17/00, at 172.) In the same period, black mothers in WHSD were almost twice as likely as white mothers to give birth to a low-weight baby (13.3% to 7.3%), (Commw. Exs. 1089, 1104, 1121; Tr. 4/17/00, at 173), and the infant mortality among blacks was 1.25 times greater than the rate among whites (13.54 per thousand compared to 10.79 per thousand),

**20.** Dr. Singh analyzed the most current data available for certain demographic variables that have been shown to influence academic achievement: (1) percentage of persons age 16 and older who are unemployed; (2) percentage of households with children with income less than $25,000; (3) percentage of families with children in poverty; (4) percentage of families with school-age children in poverty; (5) percentage of persons age 25 and older without high school diplomas; (6) percentage of households headed by a single parent; (7) rate of teen fertility; (8) rate of infant mortality; (9) rate of births to single mothers; (10) rate of low-weight births; and (11) percentage of persons with bachelor's degrees. (Tr. 4/17/00, at 160–77; Commw. Ex. 1089.)

(Commw. Exs. 1089, 1102 & 1119; Tr. 4/17/00, at 171).

African–American and white students, then, may be subject to substantially different influences outside the schools, and the environment outside the schools for many black students is likely to be less conducive to academic success.

Research has determined that students from socioeconomic backgrounds which are less conducive to academic achievement will score somewhat lower, on average, on standardized tests than students whose environments are more advantageous for academic success. (Commw. Ex. 1031; Tr. 4/25/00, at 20–27.)

*(v)*

Plaintiffs countered Dr. Armor's testimony with a statistical analysis of test score data by Dr. de Leeuw, who criticized Dr. Armor's methodology and conclusions.

Dr. de Leeuw was highly critical of the use of early test scores as a proxy for socioeconomic status ("SES"). He noted that SES is only one of many factors which affects early test scores. (Tr. 5/2/00, at 46.) We agree with Dr. de Leeuw that many different factors likely affect early test scores; however, none of those other, unnamed factors can be school-related, since the students being tested in kindergarten or in first grade are just beginning their school careers. We are in accord with Dr. Armor's conclusion that the District is not responsible for the achievement gap that already exists when children first enter school. (Tr. 4/25/00, at 17.)

Dr. de Leeuw also disagreed with Dr. Armor's analysis of the achievement gap over time, which essentially demonstrated that the achievement gap present when children enter the Woodland Hills School District is still present when they are tested in the sixth grade. (Commw. Ex. 1034; Tr. 4/25/00, 23, 24.) Dr. de Leeuw's conclusion from this data is that the schools have clearly failed to provide a

uniform education to all or their students. (Tr. 5/2/00, at 54). One possible explanation, he suggested, is that children with low test scores are placed in lower level courses. (Tr. 5/2/00, at 50.)

The record in this case, however, clearly establishes that children in the Woodland Hills elementary schools have been taught in homogeneous, detracked classrooms at least since 1990. (1990 R & R at 32.) Moreover, it is likely that the children who have tested the lowest have been provided with remedial tutoring and other compensatory programs. We agree with Dr. Armor's testimony that the achievement gap is caused by family and socioeconomic factors outside the control of the school district. (Tr. 4/25/00, at 17, 24.)

*Conclusions of Law:*

■ Although our remedies have not addressed test scores directly, they provide significant evidence that a racial disparity in achievement unfortunately remains. Courts considering scores on standardized tests as evidence of an achievement gap, however, generally accord them little weight in determining the question of unitary status, and the Supreme Court has suggested that measuring student achievement against national norms may not be the proper test to use. *Missouri v. Jenkins,* 515 U.S. at 100–01, 115 S.Ct. 2038. This case, though, stands in a slightly different posture from at least one of the cases cited by the defendants,[21] inasmuch as we have previously determined that the disparity in achievement is causally related to the constitutional violation in this case. Thus we conclude that the defendants have the burden of showing that the remaining gap is caused by external factors, and that the District has in fact done all that is practicable to narrow the divide.

Other federal courts considering the achievement gap in the context of school desegregation have determined that socio-

---

**21.** *Coalition,* 90 F.3d at 776–77 ( racial disparity in academic performance never identified as a vestige of discrimination by the district court);

economic factors and family background explain most if not all of the difference in students' test scores. *See Jenkins,* 515 U.S. at 120, 115 S.Ct. 2038, 132 L.Ed.2d at 89 ("numerous external factors beyond the control of [schools] affect minority student achievement"); *People Who Care,* 111 F.3d at 537 ("The social scientific literature on educational achievement identifies a number of other variables besides poverty that explain differences in scholastic achievement, such as the educational attainments of the student's parents and the extent of their involvement in their children's schooling"); *Coalition,* 90 F.3d at 766 n. 17 (sub-standard academic achievement is "the product of many complex socio-economic factors"); *Manning v. School Bd. of Hillsborough County,* 24 F.Supp.2d 1277, 1334 (M.D.Fla.1998) ("differences in academic performance... are the result of socioeconomic factors unrelated to the schools"); *Capacchione,* 57 F.Supp.2d at 272 ("numerous external factors beyond the control of a school district affect educational outcomes"); *Flax,* 725 F.Supp. at 330 ("Poor achievement scores are often an incidence of poverty and family environment, matters not remediable by a school desegregation plan").

The Constitution does not require that a school district eliminate every trace of racial disparity between standardized test scores.

> Although the Constitution requires that all of its citizens have equal access to the pursuit of education, and that they be given equal breaks while attending school, it does not insist that they all finish even. The proper test under the Constitution is equality of opportunity, not of results.

*Coalition,* 90 R.3d at 766.

We must also recognize that there are limits to what court-ordered remedies can accomplish. As the Supreme Court stated in *Swann:*

> We are concerned in these cases with the elimination of discrimination inherent in the dual school systems, not the myriad factors of human existence which can cause discrimination in a multitude of ways on racial, religious, or ethnic grounds. The target of the [desegregation cases] was the dual school system. The elimination of racial discrimination in public schools is a large task and one that should not be retarded by efforts to achieve broader purposes lying beyond the jurisdiction of school authorities. One vehicle can carry only a limited amount of baggage.

*Swann,* 402 U.S. at 22, 23, 91 S.Ct. 1267.

Dr. Armor's testimony demonstrated that the difference between average black and white student achievement in WHSD is not attributable to racial discrimination or the vestiges of prior segregation, but rather to socioeconomic differences between black and white students in the Woodland Hills School District, Pennsylvania and the United States. (Commw. Ex. 1031; Tr. 4/25/00, at 11–12, 23–27.) We therefore conclude that the remaining disparity in achievement, though extremely troubling, is not a vestige of the constitutional violation in this case. It is clear to the Court that insofar as the defendants have complied with our orders to fund and implement remedial and compensatory educational programs, that they have done everything practicable to reduce the racial disparity in academic achievement. The existing gap is attributable to family and socioeconomic factors which are outside the control of the District. If the District had fully complied with our order to revise its curriculum, this disparity would not be a bar to a finding of unitary status.

The disparity in achievement does not convince us that the court-ordered remedial programs have had no effect. Without them, it is certainly plausible that the evidence would show an even greater gap. Part of the rationale for the compensatory programs was to provide academic support for children as they move to a detracked curriculum. Inasmuch as the secondary school math curriculum has not been fully

redesigned, some of these remedial programs still have a role to play as students adapt to a fully detracked curriculum.

Since the District has not yet achieved unitary status with respect to curriculum and assessment, we will order that a number of the court-ordered compensatory programs be continued for the next three years. To some extent, we will follow the District's lead in determining which programs have been most effective, as discerned from the Transition Plan as well as from Dr. Herman's testimony.

We will direct the District to continue the community based tutorial programs, at current levels, for all students during the next three years. The District should also continue the in-school compensatory tutoring labs for mathematics presently available to all students in the junior high and high schools.

We agree with the District that higher order thinking skills are now an integral part of the elementary schools' instructional program, and the District will no longer be required to provide the HOTS program. Nor will we order SAT Prep or KIDS as part of the ongoing remedy.

We will further order that certain remedial programs be phased out and not abruptly discontinued, since to do so would be detrimental to the children presently being served by them. These programs are Reading Recovery, Summer Enrichment Program, and the Summer Learning Experience. These programs shall operate for the 2000–2001 school year and the following summer.

It is hoped that the District will secure outside funding for at least some of these programs during this transitional year.

## Staff Development

*Findings of Fact*

The 1990 R & R stressed the importance of staff development in the desegregation process, to assist staff and teachers on the transition from homogeneous to detracked, multicultural classrooms. (1990 R & R at 61.)

WHSD has in place a staff development plan, prepared under the direction of Assistant Superintendent Webb, which describes WHSD's staff development offering for the upcoming year and states how the various seminars fit within WHSD's mission, vision and beliefs statements and the curriculum. While WHSD has had annual staff development plans in place since the 1996–97 school year, staff development related to the desegregation remedy was occurring regularly since the merger. (WHSD Ex. 66, 67, 68 and 69; Tr. 4/4/00, at 153–54; Tr. 4/12/00, at 109–12; Tr. 4/13/00, at 39–51; Tr. 4/25/00, at 148–50.)

The District has complied with our order and entered into a contract with LRDC for staff development assistance. (Tr. 4/12/00, at 41, 43.) WHSD personnel, including Fairless Intermediate School Principal Leah McCord, have presented staff development seminars at LRDC conferences. (Tr. 4/17/00, at 8.) Staff development with LRDC has focused on the New Standards assessments and standards-based instruction, and remains incomplete. (Tr. 4/10/00, at 176–181.)

*Conclusions of Law*

To date, the District has complied with Court-ordered remedies and designed and implemented a staff development program to improve instructional techniques as well as discipline management skills for the multicultural classroom. However, given our conclusion that the math curriculum remains to be detracked, it follows that some staff development will need to be done as well. We therefore find that the defendants have not achieved unitary status in the area of staff development.

## Guidance and Discipline

*Findings of Fact:*

The evidence on discipline produced at the 1990 hearing was indeed discouraging. The R & R found that discipline throughout the District was "racially dispropor-

tionate and excessive," and that the percentage of minority students involved in incidents of discipline was "out of all proportion to the percentage of minority students in the school population." (1990 R & R at 20.)

African American students were being suspended in disproportionate numbers, and were also suspended for longer lengths of time. (1990 R & R at 21.) In addition, "the volume of disciplinary incidents in relation to the size of the school is consistently high and plainly excessive compared to norms for schools of comparable size and makeup." (1990 R & R at 22.) [22]

The proposed remedial plans, submitted by both the District and the plaintiffs for the 1990 hearing, emphasized the crucial role of guidance counselors, including their involvement in discipline. (1990 R & R at 56.) We adopted the District's proposal and directed that the District hire new guidance counselors in both elementary and secondary schools, as well as a Home/School Visitor for each of the District's three attendance zones, to deal directly with parents on attendance problems, repeat discipline problems, and other matters. (1990 R & R at 57.) We further ordered that the District conduct a reorganization of the Guidance Department. (1990 R & R at 59.)

In the fall of 1996, when the parties were still unable to resolve differences as to the remedy on guidance and discipline, Special Master Mark Fatla held hearings and issued a Report and Recommendation. The evidence established that the District had not fully implemented the court-ordered remedies and its remedial efforts had been ineffective in reducing both the volume and racial disparity in discipline. (1997 R & R at 11.) Indeed, there had been little positive change since 1990, and, at all grade levels, African–American children were still being suspended at nearly twice the rate of their percentage of enrollment in the school district. (1997 R & R at 8–9.) In 1995–96, East Junior High school exceeded 42% African–American for both total suspensions and days suspended, and West Junior High was 60% for both categories. (1997 R & R at 8). One positive note was that the high school had reduced both the volume of discipline and the racial disparity to within the target range set forth in the Consent Decree. (1997 R & R at 11.)

We adopted the R & R, and ordered the District to revise the Code of Student Conduct and to reorganize the Guidance Department and consolidate guidance functions under a full-time administrator. (1997 R & R at 27–28; Order 6/11/97.) We also reemphasized the importance of accurate data collection and evaluation in the area of discipline, and made certain recommendations in this regard. (1997 R & R at 35.) Finally, we stressed that the defendants would be expected to make "a demonstrable and sustainable improvement in the volume and racial disparity in discipline," or to establish the existence of other causative factors to explain any continuing disparity. (1997 R & R at 20.)

*(i)*

WHSD has revised and implemented a Code of Student Conduct [23] ("Code of Con-

22. In 1988–89, out-of-school suspensions ("OSS") at the high school were 56% black, while the student population was only 21% black. At Fairless Elementary School, grades 4–6, the statistics for both 1987–88 and 1988–89 showed that out-of-school suspensions in both years were 80% black, whereas the student population ranged from 30% to 32.9% black during that period. (1990 R & R at 22.)

23. The Commonwealth's expert witness, Dr. Charles Achilles, measured the Code of Con-

duct against established criteria for fair and equitable codes of student conduct. He also reviewed the process of developing, updating and disseminating the Code. (Tr. 4/20/00, at 38; Commw. Exs. 1059, 1173.) According to Dr. Achilles' expert opinion, the WHSD Code compares favorably with the criteria for a fair and unbiased code; contains nothing that is prejudicial or biased toward any group; is fair, non-discriminatory and a reasonable guide for appropriate student behav-

duct"), which Plaintiffs have agreed meets the Court's guidelines. (Ex. WH 46; Tr. 4/4/00, at 64–65.)

WHSD ensures that its principals, teachers, students and parents are knowledgeable about the Code of Conduct. Administrators review the Code with the principals prior to the start of each school year. (Tr. 4/26/00, at 16–17.) The principals review the Code with teachers at the beginning of the school year, and newly hired teachers receive in-service training regarding the Code. (Tr. 4/26/00, at 17.) Students at all school levels participate in an assembly at the beginning of the school year during which the principal reviews the Code at length with students. (Tr. 4/26/00, at 17–18.) In addition, teachers at all school levels spend classroom time at the beginning of the school year reviewing the Code at length with students. (Tr. 4/26/00, at 18.) At the secondary level, students sign a sheet signifying that they have received the Code and understand the behavioral expectations specified in the Code. At the primary and intermediate levels, the Code is sent home to parents. (WHSD Ex. 47; Tr. 4/4/00, at 65–67; Tr. 4/26/00, at 17–19.)

*(ii)*

In addition to the revised Code of Conduct, WHSD has developed and implemented a Discipline Plan, which was previously approved by the Court, to manage student behavior. Through a "time out" approach, the Discipline Plan uses progressive discipline to minimize student separation from the classroom. (WHSD Ex. 42; Tr. 4/4/00, at 54–63; Tr. 4/26/00, at 13–15.)

Discipline Review Committees are in place at each school building in WHSD to review chronic behavioral problems and other discipline-related concerns. (WHSD Ex. 45; Tr. 4/26/00, at 25.) The committees consist of the principals, guidance counselors, teachers, parents, students and

ior. (Tr. 4/24/00, at 38, 41–44; Commw.

any other necessary personnel. (WHSD Ex. 45.)

In addition, WHSD has established a Discipline Review Panel to review cases of students who have been involved in five or more incidents of discipline. (WHSD Ex. 45; Tr. 4/26/00, at 22.) The panel consists of Assistant Superintendent Wilson and a principal, guidance counselor, teacher, parents and students. (WHSD Ex. 45; Tr. 4/26/00, at 22.) The panel considers ways in which the student's behavior can be changed to encourage success. (Tr. 4/26/00, at 22–23.)

WHSD employs many different resources and behavior-modification measures before resorting to suspensions. These measures include conferences with parents, individual and group counseling, detention, referrals to the special education director, and referrals to outside agencies. (WHSD Ex. 42, Tr. 4/4/00, at 58–64; Tr. 4/26/00, at 26–28.) As an alternative to suspensions, WHSD maintains a Saturday School program to minimize lost instructional time. (Tr. 4/4/00, at 6.)

In 1998–99, only about 13% of the more than 19,000 incidents of misbehavior resulted in some type of in-school or out-of-school suspension. (Tr. 4/26/00, at 28–29.)

Pursuant to state law and regulations, WHSD follows several due process procedures in administering suspensions. For a suspension of three or fewer days, a letter is sent home to parents. Although parent conferences are not required for suspensions of three or fewer days, such conferences are often held. For suspensions longer than three days, a parent conference or informal hearing is held. At such conferences or hearings, the principal, student, parents and teachers are involved. (Tr. 4/26/00, at 29–30.)

WHSD monitors the levels of discipline administered by individual teachers through a policy whereby teachers with five or more disciplinary referrals in a particular month meet with the building's

Exs. 1059, 1062, 1062–A.)

principal to examine the circumstances of the referrals. (Tr. 4/4/00, at 70; Tr. 4/26/00, at 24–25.)

Dr. Roslynne Wilson, WHSD's Assistant Superintendent for Administration, testified that the Code of Conduct is implemented uniformly across the district and that there is no racial bias or discrimination occurring in the imposition of discipline. (Tr. 4/26/00, at 30.) Plaintiffs' expert witness, Dr. William Gordon, agreed that all necessary procedural and structural components of WHSD's disciplinary plan are in place. (Tr. 5/8/00, at 20, 27.) The Court has no doubt that the Code of Conduct is being fairly implemented by the District's administrators, and that students and staff alike have notice of its provisions.

*(iii)*

The District has also complied with our order to reorganize the Guidance Department and to hire a Director of Guidance. (WHSD Ex. 40; Tr. 4/4/00, at 45.) The District's reorganized guidance program consists of group guidance activities, individual guidance activities, career enhancement activities, and assistance in student planning and scheduling. (WHSD Ex. 40; Tr. 4/4/00, at 53.) Plaintiffs' witness, Dr. Gordon, agreed that the guidance plan has been implemented and that the Director of Guidance, Dr. Elmer Haymon, is an outstanding administrator. (Tr. 5/8/00, at 19, 144.)

Under Dr. Haymon's leadership, WHSD has developed a career education plan to inform students of various educational and vocational opportunities and mentor students in pursuing their chosen career paths. (WHSD Ex. 40; Tr. 4/4/00, at 48–50.)

Dr. Haymon testified that he updated and restated the District's Guidance Plan, using a framework developed and implemented at the secondary schools. In doing so, Dr. Haymon met several times with Dr. Herr to review the plan revisions. (Tr. 4/26/00, at 137–39.)

The secondary school guidance counselors encourage all students to participate in extracurricular activities and so-called higher-level courses. Dr. Haymon reviews the counselors' activities each month to ensure the counselors are carrying out their duties. (Tr. 4/26/00, at 146–47.)

To address student behavior problems and to encourage constructive dispute resolution, WHSD offers conflict resolution and mediation training to teachers, guidance counselors, students and community members. (Tr. 4/26/00, at 143–44.) Peer mediation is being used successfully as an intervention to other disciplinary policies in the junior high schools. (Tr. 4/26/00, at 144–46; WHSD Ex. 100).

*(iv)*

Testimony regarding the substantive issue of racial disparity in discipline within the District addressed two distinct, though certainly related, areas: racial disparity in the number of incident reports or incident levels, and racial disparity in the severity of the discipline meted out. It is undisputed that racial disparity in both categories still exists. (Achilles Tr. 4/24/00, at 109–10.) The argument is over what causes it. Plaintiffs contend this is evidence of continuing racial bias, and thus causally related to the original constitutional violation. Defendants argue that the disparity is not as great as plaintiffs claim it is, and that it is not a vestige of the constitutional violation but may be explained by racial differences in socioeconomic status.

*Racial Disparity in Incident Levels*

Plaintiffs' expert Dr. Gordon testified that the discipline levels at the high school—the number of instances where discipline was imposed—have shown a substantial drop in the past two years and are now within what he would expect as the normal range for a high school with that number of students. (Tr. 5/8/00 at 29–30.) Dr. Gordon also stated that he is satisfied with the discipline levels at the elementary schools. (Tr. 5/8/00 at 31.) Discipline statistics at the junior high schools continue

to be troublesome to the Court.[24] Certainly, excessive volume is a concern since it falls disproportionately on African–American students, removing them from instruction. However, our focus here is on the fact that black children are disciplined more often than white children at every grade level, and on whether this disparity remains causally related to the underlying constitutional violation.

Dr. Charles Achilles, a professor of educational administration at Eastern Michigan University, testified for the defendants as an expert in the field of educational leadership, administration, and school discipline. Dr. Achilles' methodology compared racial disparity in both the number and severity of disciplinary actions using a statistical suspension index.[25] (Achilles Tr. 4/20/00 at 46–47; Commw. Ex. 1061, 1061A.) He used this analysis to address the discretion inherent in the disciplinary process, which the plaintiffs contend offers opportunity for racial bias.

Dr. Achilles' analysis of the number of reported incidents (total referrals) for 1997–1998 shows a District-wide index of 1.54 for African–American students as opposed to an index of 0.63 for white students. (Commw.Ex. 1066A.) For 1998–1999, the index for black students is 1.45, compared to 0.64 for white students. (Commw.Ex. 1067A.) A clear disparity exists between the number of times an incident report is made out for an African–American child, and the number of times such a report is completed for a white child. However, the consistency of the indices from year to year *within* a racial

group or gender group indicates that discipline has been applied consistently over time and, therefore, follows well-established guidelines. (Tr. 4/24/00, 72–75; Commw. Ex. 1059, 1070, 1070A.)

Plaintiffs' expert, Dr. Gordon, questioned the reliability of the incident reports themselves. He suggested that since the entire disciplinary process starts with the teachers, who make out the original incident reports, a teacher's subjective perception of what has happened is key. He explained that this perception may be racially biased. Dr. Gordon admitted, however, that he had done no investigation to support his theory. (Tr. 5/8/00 at 33–40, 90.)

### Racial Disparity in Severity of Discipline Imposed

Statistics showing the number of in-school suspensions ("ISS"), out-of-school suspensions ("OSS") at several levels, or a combined total suspensions, also present a clear racial disparity. For 1991–1992, the index for total number of suspensions for black students was 1.59; for white students it was 0.76. That index in 1997–1998 was 1.61 and 0.58, for African–American and white students respectively; in 1998–1999 it was 1.50 and 0.62. (Commw.Ex. 1074A.)

However, contrary to what one might expect if the degree of discipline imposed was causally related to the race of the student, Dr. Achilles demonstrated that the disparity in suspensions between black and white students is less for offenses involving discretionary judgment on the

---

**24.** The total number of disciplinary referrals in the District during the 1997–1998 school year was 8,455, which may be broken down as follows: grades K–3: 319; grades 4–6: 1,462; grades 7–9: 5,879; and grades 10–12: 795. Commw. Ex. 1066A. The number of referrals for the 1998–1999 school year shows grades K–3: 195; grades 4–6: 941; grades 7–9: 5,625; and grades 10–12: 1,109 for a total of 7,870 incidents. Commw. Ex. 1067A.

**25.** The index for Out of School Suspensions (OSS) for black students, for example, is cal-

culated by dividing the percentage of suspensions issued to black students by the percentage of black students in WHSD. The OSS Index for black students in 1998–99 was 1.61. The corresponding Index for white students in 1998–99 was .53. An index of 1.0 would mean that the suspensions of a group and the group's enrollment are exactly the same, or proportional at 1:1. An index of 1.0 is equivalent to a proportion of 1:1. (Commw.Ex. 1059, 1061, 1061A.)

part of teachers and administrators than for objective offenses. As the level of administrator discretion decreases and the number of due-process safeguards increases, the extent of racial disparity goes up, not down. If the District were discriminating against African–American students, one might expect the opposite, that the degree of racial disproportion would be higher when the offenses are more subjective and the administrator has more discretion.[26] (Tr. 4/24/00, at 87–89; Commw. Exs. 1059, 1073C.)

Dr. Achilles also analyzed multiple suspensions, that is, where the same student was suspended more than once. He concluded that a small percentage of students are responsible for the overwhelming majority of misbehavior leading to suspensions. In 1997–98, only 229 students (161 black, 65 white, 3 other), or 4% of the total WHSD student population, had 5 or more suspensions, accounting for 2,136, or 58%, of multiple suspensions. Likewise, in 1998–99, less than 4% of the students were responsible for about 66% of the misbehavior leading to suspensions. (Tr. 4/24/00, at 81–82; Commw. Ex. 1059.)

Dr. Gordon analyzed only the annual number of suspensions by race; he did not include any analysis which reflects the absence or frequency of multiple incidents of misbehavior. Gordon Tr. 5/8/00 at 51.

Dr. Achilles provided further testimony that discipline in the District is not racially discriminatory. He demonstrated that black students are suspended as frequently and in the same proportions by black administrators as by white administrators. Dr. Achilles' suspension indices for black and white students were essentially the same, regardless of the administrator's race. (Tr. 4/24/00, at 94–99; Commw. Exs. 1059, 1075 & 1075A.)

*(v)*

The defendants contend that the remaining racial disparity in the number of reported disciplinary incidents and the severity with which students are disciplined is not a vestige of discrimination but rather is attributable to socioeconomic differences between the white and African–American communities in the District.

In addition to the broad socioeconomic and demographic data previously described,[27] Dr. Singh also provided statistics showing that the arrest rate for African–Americans in the District is significantly higher than for whites, and that the arrest rate for males is significantly higher than for females.[28] (Commw.Ex. 1123, 1124.)

---

**26.** Specifically, Dr. Achilles compared the degree of racial disproportion for more severe and less severe offenses, based on evidence that less severe offenses involve more administrator discretion and fewer due-process safeguards, and vice versa. Indicating that with more discretion there is less racial disproportion, Dr. Achilles' indices for Level 1 offenses (*less severe*) were *consistently lower* for black students than the indices for Level 2 offenses (*more severe*). If racial discrimination was occurring in WHSD's disciplinary practices, one would expect to find it in situations where the disciplinarian has more discretion, not less. (Tr. 4/24/00, at 69–72; Commw. Exs. 1059, 1069 & 1069A.)

Similarly, when Dr. Achilles compared offenses which are relatively "objective" (conduct that may be subject to less interpretation) to offenses which are relatively "subjective" (conduct may be subject to more interpretation), he demonstrated that so-called "subjective" offenses, where there is more administrator interpretation and discretion, were treated the same as "objective" offenses, which involve relatively less interpretation on the part of the person administering discipline. (Tr. 4/24/00, at 87–89; Commw. Exs. 1059, 1073C.)

**27.** See, *infra*, pp. 600–01.

**28.** The arrest rate for adults age 18 and older is a reliable indicator of the proportion of the population in a community engaged in criminal activity. The same indicator has been used by federal courts in determining whether school districts are administering discipline disproportionately based on the student's race. (Tr. 4/24/00, at 101; Commw. Ex. 1059); *see Coalition,* 90 F.3d at 774–777, 778–80; *Reed,* 1 F.Supp.2d at 721–725, 750–769.

The arrest rate for African–Americans age 18 and older in the WHSD area is more than five times as high as the rate for whites (111.6

Using Dr. Singh's data as well as statistics provided by Woodland Hills, Dr. Achilles testified that the differences in discipline statistics between black and white students in the District result from differences in behavior, and not from racial discrimination on the part of WHSD's teachers and administrators. Dr. Achilles further testified that the differences in behavior among WHSD students reflect socioeconomic factors in students' lives outside the schools, not racial discrimination within WHSD's schools. (Tr. 4/24/00, at 74–76, 161–62.)

Dr. Achilles demonstrated that a similar pattern of disparity occurs when variables such as gender and family income are considered instead of race. As between blacks and whites, the degree of disproportion in discipline statistics was consistently higher for males than for females, and for students in free lunch than for those not in free lunch. (Tr. 4/24/00, at 72–75; Commw. Exs. 1059, 1070 & 1070A.)

By the same token, as the severity of the offenses increased (with a corresponding decrease in the amount of the administrator's discretion in disciplinary action), the indices typically increased for black students, for males and for students who participate in the free lunch program. This consistency across different groups demonstrates that disciplinary decisions in WHSD follow well-established guidelines, and are not based on one status variable alone, such as the student's race. (Tr.

4/24/00, at 72–75; Commw. Exs. 1059, 1070 & 1070A.)

Dr. Achilles' finding with respect to gender and free-lunch status is consistent with social science research and other indicators, such as arrest and incarceration rates, that show misbehavior is more frequent among children raised in poverty.[29] (Tr. 4/24/00, at 75.)

Plaintiffs presented the expert testimony of Dr. Jan de Leeuw, to refute the defendants' interpretation of the data on discipline. Although he disagreed with the theory that SES had a strong influence on the discipline data in this case, Dr. de Leeuw agreed with the defendants that a disparity in discipline rates alone does not prove racial discrimination. (Tr. 5/2/00, at 139, 154–55.)

Dr. de Leeuw's analysis of discipline statistics was not persuasive, since he failed to account for a variety of factors which he conceded determine disciplinary penalties, including the nature of the offense, the specific violation, the particular circumstances, the age of the students, and the students' disciplinary history. (Tr. 5/2/00, at 144–45, 153–54.) Furthermore, his analysis was limited to only one school year, 1994–95. (Tr. 5/2/00, at 147.)

*Conclusions of Law*

We are not the first court to struggle with whether a racial disparity in student discipline is a vestige of the constitutional violation, or remains despite the school district's having done all that is

---

per thousand compared to 19.1 per thousand). (Commw. Exs. 1090, 1106 & 1123; Tr. 4/17/00, at 174–75.)

Likewise, the arrest rate for males age 18 and older in the WHSD area is almost five times as high as the rate for females (54 per thousand compared to 11.3 per thousand). (Commw. Exs. 1090, 1106 & 1124; Tr. 4/17/00, at 175.) Consistent with the relative arrest rates, male students and black students are disciplined at higher rates than female students and white students. (Tr. 4/24/00, at 101–103.) National discipline studies and arrest rates demonstrate that student misconduct, of the type seen in WHSD, is more

prevalent where students are exposed to higher rates of unemployment and poverty. (Tr. 4/24/00, at 101–106; Commw. Ex. 1059.)

29. In addition, the defendants presented comparative data demonstrating that the District's discipline indices are lower than the indices of other school districts which have achieved unitary status, including those districts declared unitary by the district court in Wilmington, Delaware. WHSD's indices also compare favorably with, or are lower than, indices from national school suspension data reported by the Office for Civil Rights. (Tr. 4/24/00, at 66–68; Commw. Exs. 1059, 1078, 1078A, 1080 & 1080A.)

practicable to reduce or eliminate this imbalance. Courts have declared unitary status despite a remaining disparity in this area. *Coalition*, 901 F.Supp. at 816–17; *Coalition*, 90 F.3d at 774; *Capacchione*, 57 F.Supp.2d 228, 281 (W.D.N.C.1999); *See also People Who Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 538 (7th Cir.1997) (reversing remedial relief requiring that students be disciplined in proportion to their percentage in the school population, and finding that "[r]acial disciplinary quotas violate equity in its root sense. They entail either systematically overpunishing the innocent or systematically underpunishing the guilty"). In addition, we are in agreement with the court in the Cleveland City School District case, which concluded that "[a] numerical disparity, standing alone, does not indicate discrimination." *Reed v. Rhodes*, 1 F.Supp.2d 705, 725 (N.D.Ohio 1998).

We find that the defendants have met their burden of proof on the issue of guidance and discipline, with one exception: It is one of the functions of the Guidance Department to assist students with academic planning and scheduling, and the Guidance Department will have a role to play as the District fully implements detracked curriculum. To that end, we will continue our remedy as to guidance personnel. We shall order that the Director of Guidance and guidance counselor positions at all grade levels be maintained, with appropriate clerical support, and that they be gradually reduced over the next three years as set forth in the District's Transition Plan.

With that condition, we find that the District has achieved unitary status in the area of guidance and discipline.[30] We are satisfied that the Code of Student Conduct and the discipline plan the District has put into place are fairly applied throughout the District and are not racially discriminato-

ry. Although the lingering racial imbalance is distressing to the Court, we conclude that the District has accomplished the remedy to the extent practicable, and that much of the disparity must be attributed to socioeconomic conditions. The Court is well aware of the disheartening correlation between race and poverty on the one hand, and disciplinary problems in children or arrest and incarceration rates in older individuals on the other, which plagues contemporary America. On the evidence presented at the hearing, we must conclude that the District's discipline policies and procedures are unitary, notwithstanding the differences between the number of disciplinary actions involving African–American students and those involving white students, and that further judicial oversight in this area is unnecessary.

**Good Faith**

Having determined that the vestiges of past discrimination have been eliminated to the extent practicable with the exception of detracking the mathematics curriculum, we now turn to the second prong of the Supreme Court's standard for unitary status and consider whether the defendants have complied in good faith with the desegregation orders imposed by this Court since 1971. *Dowell*, 498 U.S. at 249–50, 111 S.Ct. 630.

As the Supreme Court has explained, the school district must "show its good-faith commitment to the entirety of a desegregation plan so that the parents, students, and the public have assurance against further injuries or stigma." *Freeman*, 503 U.S. at 498, 112 S.Ct. 1430.

Plaintiffs contend that previous delays in the design, funding, and implementation of court ordered remedies demonstrate that the defendants have not acted with the good faith necessary for a finding of unitary status. Initially, we note that even in

---

**30.** It seems to us the better decision to grant unitary status, subject to the condition that certain guidance personnel be retained for a transition period until the District completes curriculum and assessment redesign, than to deny unitary status and retain supervision over a disciplinary process which we have determined to be unitary.

the early days of this litigation, when the Commonwealth balked at funding its share of the remedy and when the District seemed unable to come up with proposed compensatory programs that were truly remedial, we never made a formal finding of bad faith, nor were we asked to do so.

Good faith, though, requires more than simply an absence of bad faith. *Freeman*, 503 U.S. at 498–99, 112 S.Ct. 1430. In addition to looking backward to assess the defendants' conduct during the course of the litigation, a good faith inquiry in the context of motions for unitary status requires that the court look into the future, and consider whether the school district's record of performance inspires confidence that the district will continue to be concerned with the equality of educational opportunity for all of its students. *Mills v. Freeman*, 942 F.Supp. 1449 (N.D.Ga.1996).

■ The evidence shows that the District—with funding and assistance from the Commonwealth—has developed an educational program designed to improve the academic performance of all students, including African–American students. The Court is confident that, with the exception of its failure to eliminate tracking in mathematics, the District now provides an equal educational opportunity to all of its students, regardless of race. With the exception of our order to revise the curriculum to eliminate tracking, and the corresponding remedial work remaining in the areas of assessment, staff development, and guidance, the District is in compliance with all other orders of court. Accordingly we find that the defendants here have acted in good faith, and we have every reason to expect that the District will continue to offer an equal education to all students.

Good faith may also be measured by school board attitudes, policies, and decisions. *Brown v. Bd. of Educ. of Topeka*, 978 F.2d 585, 588 (10th Cir.1992). The Board, although often opposed to judicial supervision and to many of our remedial programs, nevertheless supported Dr.

Herman on the issue of detracking the Language Arts curriculum in the face of strong opposition by some white parents as well as by many of the teachers who taught the upper level courses. (Tr. 4/10/00, at 57–60.) Its current President, Dr. Randy Lott, testified at the hearing, and demonstrated a commitment to racial equality after court supervision ends. (Tr. 5/9/00, at 21–22, 34–35.)

As to the Commonwealth, it has met its obligation to fund 90 percent of the cost of the desegregation program, contributing more than $30 million since 1991. (WHSD Ex. 35, 38.)

We therefore find that, at this time, the defendants have shown the requisite good faith which is a component of our decision on unitary status.

### Remedy

The Supreme Court's school desegregation jurisprudence has long held that the extent of the constitutional violation defines the scope of the remedy. *Milliken v. Bradley*, 418 U.S. 717, 746, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). This was the law in the earliest, remedial stages of these cases, and the principle still holds as one court after another considers whether unitary status has actually been achieved. We have determined that the defendants here have achieved unitary status as to most aspects of this case, and the remedy we impose must be correspondingly diminished.

Equity permits a federal court "to relinquish supervision and control of school districts in incremental stages, before full compliance has been achieved in every area of school operations." *Freeman*, 503 U.S. at 490–491, 112 S.Ct. 1430. "A transition phase in which control is relinquished in a gradual way is an appropriate means to this end." *Id.* at 490, 112 S.Ct. 1430. Where vestiges of a dual system remain in some, but not all, areas under judicial supervision, the district court will retain jur-

isdiction over the school system, but need no longer supervise those factors as to which compliance has been achieved. *Id.* at 507, 112 S.Ct. 1430 (Souter, J. concurring).

(i)

A vestige of discrimination remains in the area of curriculum, assessment, and instruction, because the District has not fully complied with our previous orders to revise and detrack the mathematics curriculum. This prevents a finding of unitary status in this area. Our remedial order will direct the defendants to provide a single, detracked, mathematics curriculum so that all children in the District have an equal opportunity to master the skills necessary to move to the variety of math courses available at the high school level.

The District shall complete detracking in the mathematics curriculum by eliminating lower level courses and providing a single, detracked math curriculum for all at the secondary level. Implementation of the District's present plans, which were the subject of much testimony at the hearing and which have been detailed elsewhere in this Opinion, would satisfy our order to provide a single, detracked curriculum. These changes include the revision of the implementation of Connected Mathematics for all students in the 6th, 7th, and, perhaps, 8th grades; the implementation of Pump Algebra for all students at the same grade level; and the elimination of pre-algebra, math 7, and math 8, which the Court has determined are lower level courses. Testimony indicated that the District expects to complete these changes in three years.

We do not intend to micromanage the District's curriculum, which is properly the function of the schools and the school board. However, these changes were proposed by the District, and would meet our requirements to detrack this curriculum.

The other curricula have been successfully revised and no longer require the Court's attention. However, implementing the appropriate assessments remains to be done. To that end, we will further order the District to implement appropriate assessments and staff development, in order to support the curriculum presently being taught as well as the math curriculum remaining to be put in place. In addition, staff development will better enable math teachers to manage heterogeneous classrooms and instruction.

We will adjust the compensatory programs required by the current remedy in this case. We will also adopt the District's Transition Plan regarding staff development, to be led by current court-ordered personnel responsible for curriculum development and implementation as detailed in that portion of the Plan. (WHSD Ex. 87 at 10–13.)

In the area of guidance, we will order that the court-ordered Director of Guidance as well as counselors at all grade levels be retained, along with necessary clerical support, in accordance with the District's Transition Plan. (WHSD Ex. 87 at 26–29.) The Guidance staff will be important in helping children move from the currently tracked math curriculum to heterogenous, detracked classrooms. In addition, although we have found that the racial disparity in discipline is not a vestige of discrimination, we have also determined that the total volume of disciplinary incidents has decreased in the past two year. The presence of a Director of Guidance has been an important part of this reduction.

As to the items contemplated in the District's Transition Plan and incorporated in the remaining remedy here, we adopt the proposed budget contained therein and refer any appropriate revisions to the parties and the Special Master. (WHSD Ex. 87.)

Any additional funding necessary to implement the remedy shall be jointly funded by the District and the Commonwealth in the proportions already established in this case, which are ninety percent (90%) by

the Commonwealth and ten percent (10%) by the District.

## (ii)

With the exceptions articulated above, the record before us demonstrates that the defendants have complied in good faith with the remainder of this Court's remedial orders. We therefore conclude that the vestiges of past discrimination have been remedied and that the District has achieved unitary status as to all other issues in this case, and that judicial supervision of these areas shall no longer be necessary.

## (iii)

By separate communications, we have declined to renew the appointments of the court appointed Monitor, The Honorable John McLean, Jr., and the Evaluator, Dr. Stanley Frankel. Both of these individuals have the Court's appreciation for their services. Given the limited remedy remaining in this action, we do not see a future need for either of these positions. Pursuant to Fed.R.Civ.P. 53, we will continue to refer the implementation of the remedy, including the Transition Plan, to Special Master Mark Fatla. We will also order the appointment of independent consultants to evaluate the remaining remedy as necessary.

## (iv)

We shall, of course, retain jurisdiction over this case. As to matters where the defendants have achieved unitary status, the presumption that any disparities are causally related to the prior constitutional violation is now at an end, and plaintiffs will have the burden of proving otherwise. We would anticipate that the mathematics curriculum would be detracked in accordance with this Opinion by the end of the 2002–2003 school year, and that the remaining remedy in assessments and staff development will have been implemented by then as well. Those portions of the three-year Transition Plan adopted by the Court will also be at an end. This would be a logical time for final motions for unitary status.

## Conclusion

Insofar as we have determined that the District has not fully complied with our orders to detrack the mathematics curriculum, we will deny the defendants' motions to grant unitary status in its entirety, and will continue our supervision over the remaining remedy in curriculum, assessment, compensatory programs and staff development. In all other respects, consistent with this Opinion, we are satisfied that the defendants have met the legal requirements for and have achieved unitary status on all components of court-ordered relief, and we shall relieve the District of further regular judicial supervision to that extent.

Much has been made of the fact that the schools in the Woodland Hills School District have been the subject of litigation for nearly thirty years and under judicial supervision for twenty of those years, the implication being that this timeframe has been excessive and unnecessarily prolonged. School desegregation cases, however, are not susceptible to speedy adjudication. Most follow a trajectory similar to what we have seen in this case: a finding of liability; a fairly length phase during which the parties which have been on opposite sides of very heated litigation have difficulty agreeing on proposals to remedy the constitutional violation; strong opposition from many parents, teachers, and members of the community; and then a long stretch where the voluminous components of the desegregation remedy are not only implemented, but gradually take root, and the school district itself becomes an altered place. Only then can the question of whether a school district has achieved unitary status even be considered. Changes must occur not only in the routines of transporting, assigning, teaching, and evaluating students in a newly multicultural, heterogeneous educational environment, but also in the individuals—children, teachers, administrators, parents,

and the community—who truly *are* the school district.

Woodland Hills has been transformed in the past twenty-nine years, from a New District created by court order in a climate of much anger and bitterness, to a school district whose motto, appropriately, is "All Children Can Learn." We agree with defendants' expert Dr. Henderson, who described Woodland Hills as "an excellent school district striving to get better." (Tr. 4/18/00, at 38.) Even the most disheartening testimony presented at the hearing, which documented the continuing racial disparity in achievement and in incidents leading to student discipline, does not affect our conclusion that the District itself is doing a fine job of educating all of its children.

Much of the credit for this transformation belongs to Dr. Herman, both for his vision of what a dynamic, multicultural school district could be, and for his ability to work with and to inspire all of the component groups that make up this school district. He has assembled a team of dedicated teachers and administrators, and it is certainly our expectation that lifting Court-ordered supervision in most aspects of the District's affairs, will not impair the quality of education for any of the District's students.

Some measure of appreciation is also due Judge Weber. Despite public vilification and threats to his life, he understood the delicate balance between Court supervision and the school district's autonomy, and maintained a course which has brought Woodland Hills to a successful metamorphosis in less than twenty years.

Finally, we commend all of the attorneys who have been involved in this action, for their vigorous advocacy on behalf of their respective clients, and for their willingness to keep the educational needs of all of the District's children properly in the foreground of this litigation.